**MAGNAFLUX CORPORATION, a Delaware corporation, Plaintiff,**

v.

**Friedrich FOERSTER, etc., et al., Defendants.**

**No. 62 C 1419.**

United States District Court
N. D. Illinois, E. D.

Oct. 18, 1963.

Theodore C. Diller, Charles H. Weiland and Barnet C. Engler, Lord, Bissell & Brook, Chicago, Ill., for plaintiff.

Victor P. Kayser and George R. Hooper, Chadwell, Keck, Kayser, Ruggles & McLaren, Richard S. Oldberg and Hamilton Smith, McDermott, Will & Emery, Chicago, Ill., for defendants.

DECKER, District Judge.

This case involves a lawsuit by Magnaflux Corporation, a Delaware corporation licensed to do business and with its principal place of business in the State of Illinois, (hereinafter referred to as Magnaflux). Magnaflux sues Dr. Friedrich Foerster (hereinafter referred to as Foerster) for breach of a contract executed November 5, 1954, and subsequently amended July 14, 1961.

Foerster is a citizen of the Federal Republic of Germany, and he maintains his residence in the City of Reutlingen in West Germany.

Also joined as defendants in the one count complaint are three other parties alleged to have entered into a conspiracy to induce Foerster to breach his contract with Magnaflux. The three other parties are: Hoover Ball and Bearing Company, a Michigan corporation with its principal

place of business in Michigan (hereinafter referred to as Hoover Ball); Forster/Hoover Electronics, Inc., a Michigan corporation with its principal place of business in Michigan (hereinafter referred to as Forster/Hoover); and Rudolph G. Hentschel, a citizen of the State of Michigan, residing in Ann Arbor (hereinafter referred to as Hentschel).

The complaint is founded on the diversity jurisdiction of this Court. Equitable relief is sought against all four defendants, including a declaratory judgment that the contract between Foerster and Magnaflux prevents Foerster from selling his products to Forster/Hoover, an injunction of Foerster from making any further sales to Forster/Hoover, an injunction of Hoover Ball and Forster/Hoover and Hentschel from further inducing Foerster to further breach the contract, and for an accounting for damages against all of the defendants.

This matter has come on for decision on the following motions:

(1) A motion filed by the defendants Foerster, Forster/Hoover and Hentschel to dismiss the action pursuant to Federal Rule 12 on the ground that the Court lacks jurisdiction over the person of these defendants.

(2) A motion filed by Hoover Ball to dismiss the action or in the alternative to quash the return of the service of summons on the ground that the Court lacks jurisdiction over the person of the defendant.

(3) All four defendants also moved to dismiss on the ground that the complaint fails to state a claim on which relief can be granted.

The motions to dismiss for want of jurisdiction over the persons of the defendants will be discussed first. The defendants have filed a number of affidavits in support of their motions to dismiss for want of jurisdiction. Plaintiff has filed counter-affidavits in opposition to the same motions. Depositions have been taken by the plaintiff and by the defendants, and references have been made by both plaintiff and defendants to statements contained therein relating to the issue of jurisdiction.

Disposition of these motions requires individual treatment of the service of summons on each of the four defendants, and accordingly, because of the complex facts surrounding the service, each will be dealt with individually.

### Foerster

Foerster was served, by special order of court under Federal Rule 4(e), personally at his home in Germany. Foerster's service is sought to be upheld under Section 17(1) (a) of the Illinois Civil Practice Act (Illinois Revised Statutes, Chapter 110, § 17(1) (a)). Service was effected on Foerster by one Roland Willmitzer, who was specially appointed by this Court to serve the summons.

Foerster argues that to subject him to service of process pursuant to the Illinois statute would: (1) Violate Rule 4(f) which prohibited service of process out of the forum state, which in this case is Illinois, unless a statute of the United States so provided; and (2) would be improper even under the Illinois statute, since he had not "transacted any business" in Illinois, and to subject him to extra-territorial service of process without his having had more substantial minimal contacts with the State of Illinois would violate both the due process and the commerce clauses of the United States Constitution.

### Foerster's contacts with the State of Illinois are as follows:

(1) Prior to April 24, 1952, Foerster did maintain office facilities in Illinois to market his own products by himself. Subsequent to that date, he removed all of his own facilities pursuant to the contract with plaintiff Magnaflux, whereby it was given the exclusive distribution rights in the United States to Foerster's products.

(2) Foerster executed and personally delivered in Illinois the contract in suit on November 5, 1954. This contract was also to be performed in Illinois, and it is

being performed here, at least in part, presently.

(3) Paragraph 22 of this contract, which is attached as Exhibit B to the complaint, and which remains unamended, reads:

"This agreement shall be construed in accordance with the laws of the State of Illinois."

(4) On July 14, 1961, the 1954 contract was amended (the execution and delivery of this amendment took place entirely in Germany).

Foerster now contends that the 1954 contract was cancelled and superseded by the 1961 contract. However, paragraph U. of the 1961 amendment reads:

"Except as specifically amended by the foregoing paragraphs A. through T. inclusive, said agreement of November 5, 1954, shall remain unchanged and, as thus amended, shall be and remain in full force and effect between the parties hereto."

The Court finds that the 1954 contract was not cancelled, as Foerster contends, but rather it was amended.[1]

(5) Performance of this amended contract has continued, at least in part, in Illinois down to the present.

(6) Negotiations for the 1954 agreement took place at plaintiff's place of business in Illinois, with Foerster personally present and actively engaged in the negotiations from October 27, 1954, through November 5, 1954.

(7) As a part of the immediate performance of this 1954 contract, plaintiff delivered to Foerster a check for $22,-000.00, which Foerster cashed on November 6, 1954, in Chicago, by endorsing it to The First National Bank of Chicago.

(8) During the period from 1951 to 1962, Foerster spent a total of approximately 54 days at the plaintiff's plant in Illinois. These 54 days were divided among thirteen separate visits, at all of which Foerster discussed problems of manufacture and sale of Foerster equipment with plaintiff's engineers in furtherance of the 1954 agreement, as amended in 1961, and under which the plaintiff now sues. The last of these visits was on March 15 and 16, 1962, when Foerster discussed performance of the contract with Magnaflux and with some of the other defendants.

*Opinion*

(1) As for Foerster's contention that Rule 4(f) prohibits reference to the law of Illinois in order to sustain service of process made extra-territorially, reference to the amendments to the Rules of Federal Procedure which became effective July 1, 1963, should suffice.

Rule 4(f) has now been clarified to specifically authorize the service of process on an out-of-state individual or corporation, " * * * in the manner prescribed by the law of the state in which the district court is held * * *," as outlined in Rule 4(d) (7).

The Supreme Court Advisory Committee on Civil Rules in a comment states that this clarification did not change the prior law, but rather more explicitly stated and adopted "the salutary results" of those cases which sustained out-of-state service pursuant to statute such as Section 17 of the Illinois Civil Practice Act[2]

1. The amendment had the effect of abrogating plaintiff Magnaflux's exclusive distribution rights to Foerster's products in the United States to the extent that either Foerster's employees or a corporation in which Foerster owned sufficient of the voting stock to be able to elect a majority of the board of directors could also distribute Foerster's products in the United States. Such a corporation is designated by the contract as a "Forster group." It is the sale of Foerster's products by Forster/Hoover that has given rise to this lawsuit. The issue on the merits is whether Forster/Hoover is a "Forster group."

2. The pertinent provisions of the Illinois Civil Practice Act (Ill.Rev.Stats.1961, ch. 110) for determination of this case are as follows:
"§ 13.1 * * * (2) Summons may be served upon the defendants wherever they may be found in the State, by any person authorized to serve writs. * * *"

by "reading paragraph (7) as not limited by subdivision (f)."

It is also interesting to notice in the comments of the Supreme Court Advisory Committee on Civil Rules relating to paragraphs (e), (f) and (i) of Rule 4, it is stated that "the Party seeking to make the service may proceed under the Federal or the State law, at his option." Further, regarding service on a defendant in a foreign country, specifically referring to the Illinois Civil Practice Act, the Supreme Court Advisory Committee expressly commends the manner in which service was made on Foerster here:

> "Foreign service by personal delivery on individuals and corporations, partnerships and associations, provides for a manner of service that is not only traditionally preferred, but also is most likely to lead to actual notice."

And, as regards the order of this Court specifically appointing Willmitzer to make service in Germany, the Supreme Court says:

> " *  *  *  by permitting the court by order to tailor the manner of

service to fit the necessities of a particular case or the peculiar requirements of the law of the country in which the service is to be made  *  * this alternative increases the possibility that the plaintiff will be able to find a process server who can proceed unimpeded in the foreign country  *  *  *." [3]

Therefore, I hold that Rule 4(d) (7) prior to the July 1, 1963, amendment, rather than Rule 4(f), establishes the mode of effecting service on a defendant outside the state in which this Court sits. Therefore, we must look to the law of Illinois to determine whether service of process on Foerster was sufficient to give this Court jurisdiction over his person.

■ (2) In regard to Foerster's contention that even if Section 17 of the Illinois Civil Practice Act does apply, its requirements have not been satisfied, I think the law is to the contrary. There have been numerous Illinois and Seventh Circuit cases on this question, all of which I believe establish beyond any doubt that Foerster's contacts with Illinois are substantial enough to subject

---

"§ 13.3  *  *  *  A private corporation may be served (1) by leaving a copy of the process with its registered agent or any officer or agent of said corporation found anywhere in the State; or (2) in any other manner now or hereafter permitted by law.  *  *  *"

"§ 16  *  *  *  (1) Personal service of summons may be made upon any party outside the State. If upon a citizen or resident of this State or upon a person who has submitted to the jurisdiction of the courts of this State, it shall have the force and effect of personal service of summons within this State; otherwise it shall have the force and effect of service by publication."

"§ 17  *  *  *  (1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of said acts:

"(a) The transaction of any business within this State;

"(b) The commission of a tortious act within this State;  *  *  *"

"(2) Service of process upon any person who is subject to the jurisdiction of the courts of this State, as provided in this section, may be made by personally serving the summons upon the defendant outside this State, as provided in this Act, with the same force and effect as though summons had been personally served within this State.

"(3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this section."

"(4) Nothing herein contained limits or affects the right to serve any process in any other manner now or hereafter provided by law."

3. Plaintiff has cited authority which states that the personal service effected by Willmitzer here is the manner preferred by German law. Foerster does not contest this proposition.

him to service of process consistent with due process.

Rather than summarize all of these cases, I will refer to the latest Illinois authority, which exhaustively reviews all of the previous authorities. The case is Kropp Forge Co. v. Jawitz, 37 Ill.App. 2d 475, 186 N.E.2d 76 (1962). Briefly, there the plaintiff and the defendant conducted negotiations by correspondence by mail between New York and Chicago; on January 15, 1958, defendant came from New York to plaintiff's plant in Chicago, where he spent one morning conversing with plaintiff's employees, inspecting plaintiff's plant facilities, and measuring the equipment which was the subject of the contract under negotiation. The Court concluded that by his acts in the plaintiff's plant on that one morning, the defendant accepted plaintiff's offer and a contract was consummated. On the strength of these "contacts" with Illinois, the Court held that the United States Supreme Court test, as set forth in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), was satisfied, and that service was properly made on defendant in New York pursuant to Sections 16 and 17 of the Illinois Civil Practice Act. The test, as quoted in Kropp Forge, is:

> " ' * * * it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " (At p. 479, 37 Ill.App.2d, at p. 78, 186 N.E.2d.)

The defendant in that case argued that one visit alone to Illinois does not satisfy the "minimum contacts" test for jurisdiction. The Court distinguished all previous cases which held that "contracting from outside the State" was not transacting business in Illinois sufficient to give an Illinois court jurisdiction over the person of the defendant.

The Court held that the performance of one of the four jurisdictional acts set out in Section 17 by a non-resident or by his agent, "while physically present in Illinois," is essential. The one morning visit to the plaintiff's plant by the defendant at which, it was held, defendant by his conduct accepted plaintiff's offer and formed a contract, was further held sufficient by the Illinois Court to satisfy the test of the "transaction of any business within this State" as set out in Section 17(1) (a) of the Illinois Civil Practice Act.

Certainly, considering the findings set out above regarding Foerster's contacts with Illinois, service of process on Foerster in Germany pursuant to the Illinois statute should be upheld under the Kropp Forge case.

### Hoover Ball

Hoover Ball is a Michigan corporation which is not licensed to do business in the State of Illinois, but which does maintain a sales office for soliciting orders for its products in Illinois. No contracts are made at this office and all orders are forwarded to Michigan where they are accepted or rejected. Hoover Ball's business can be best described by quoting from an advertising pamphlet published by it, which is attached as an exhibit to the "Diller Affidavit" filed by Magnaflux:

> "Hoover Ball and Bearing Company serves more than 5,000 customers with a wide variety of industrial and consumer products. The company is a well-known producer of precision metal balls, ball and roller bearings, cold drawn steel and wire, automotive and furniture seat springs, blowmolded plastic containers, bulk material handling systems and metal containers, electric motor commutators, plumbing and automotive die castings and special machine tools."

Hoover Ball was served at this office which it maintains at 8581 South Chicago Ave., Chicago, Illinois. Plaintiff Magnaflux contends that by having this office in Chicago, Hoover Ball was "doing business" in Illinois and therefore subject to service at that office. Plaintiff Magnaflux also argues that Hoover Ball "transacted business" under Section 17 of the Illinois

Civil Practice Act, which would alternatively make it subject to service of process.

Hoover Ball moves to dismiss the complaint or to quash service of summons on the grounds that:

(1) The Chicago office is used merely for soliciting orders for acceptance at its home office in Michigan, and that no orders solicited in Illinois are accepted in the Chicago office;

(2) All of the products so ordered and accepted are delivered in Illinois by shipment from Michigan or Tennessee in interstate commerce only, f. o. b. the points of shipment;

(3) No discussions or transaction of any kind relating to Foerster, Hentschel or Forster/Hoover have occurred in the Chicago office which Hoover Ball maintains;

(4) None of the salesmen nor the office girl who use Hoover Ball's Chicago office have ever had any contact with Foerster or the other defendants; and

(5) Hoover Ball is not qualified as a foreign corporation to do business in Illinois.

*The contacts of Hoover Ball with Illinois are as follows:*

(1) It maintains an office in Chicago.

(2) It staffs this office with one office girl, Miss Killeen, who acts as a secretary-receptionist, and with the Sales Manager of the Central Zone of the United States, Mr. McGregor, and several other salesmen who have intermittently used the office (Messrs. Merren, Lawrence and Maschek). The Central Zone encompasses eleven midwestern states, including Illinois.

(3) In addition to working as salesmen, the employees at the Chicago office perform the additional activities of furnishing engineering services for customers, handling complaints of customers regarding the performance of Hoover Ball products and attend trade shows to exhibit such products.

(4) It lists its Chicago office in the Chicago telephone directory, the "Red Book", as "Hoover Ball and Bearing Co., Central Zone Sales Office."

(5) It purchased a full page advertisement in Fortune Magazine, which has a national circulation, and listed its Chicago office as one of its three "Zone Sales Offices."

### Opinion

(1) As regards plaintiff's contention that Hoover Ball "transacted business" in Illinois under Section 17(1) (a) of the Illinois Civil Practice Act, plaintiff misconstrues the import of Section 17.

First, even if it is assumed *arguendo* that what Hoover Ball did through its Chicago sales office satisfies the standard of "transaction of any business," Section 17 specifically qualifies its coverage in subsection (3):

"Only causes of action arising from acts enumerated herein [one of which is the transaction of business] may be asserted against a defendant in an action in which jurisdiction over him is based upon this section."

The Act does not confer jurisdiction upon a defendant unless it does two things: (a) enters into Illinois, and (b) to transact the business from which the cause of action arises. If a defendant transacts business with A, which has absolutely no relation with its dealings with B, B cannot obtain jurisdiction over the person of the defendant under the Illinois statute on the specific theory that the defendant has transacted business.

Here the plaintiff has not alleged a cause of action against Hoover Ball arising out of the transaction of any business between Hoover Ball and plaintiff. On the contrary, plaintiff's cause of action against Hentschel, Forster/Hoover and Hoover Ball is grounded solely upon the allegation of a conspiracy to induce Foerster to breach his contract with plaintiff. This is an allegation sounding in tort, and in order to satisfy Section 17 of the Illinois Civil Practice Act, plaintiff would have to establish "the commission of a tortious act within this State" under Section 17(1) (b).

Section 17(1) (a) is inapposite as to all defendants except Foerster, the only defendant alleged to have transacted business, by entering into a contract, with Magnaflux. All that plaintiff has shown is that Hoover Ball, by maintaining an office in Chicago, has transacted business with some unnamed third persons who have no relationship to this lawsuit. There is no allegation that Hoover Ball has transacted business with plaintiff in Illinois and that this cause of action arises out of that transaction of business with the plaintiff.

Secondly, and more basically, Section 17 deals with *out-of-state service* on parties whose conduct within Illinois makes them subject to the jurisdiction of Illinois courts. Here service was made in Illinois on Hoover Ball by serving personally an agent of the corporation found *in Illinois*. The return of service reads:

> "Served this writ together with a copy of complaint on the within named Hoover Ball and Bearing Co., a corporation, by delivering copies thereof to Mr. Higgins, salesman an [sic] agent, of such corporation, this 30th day of July A.D. 1962.

> "The president of said corporation not found in my district."

The return is prima facie evidence of proper service and is not to be set aside except on clear and satisfactory evidence. Marnik v. Cusack, 317 Ill. 362, 148 N.E. 42 (1925); Cannata v. White Owl Express, Inc., 339 Ill.App. 79, 81, 89 N.E.2d 56 (1949). Therefore, though the parties in their briefs extensively argue the applicability of Section 17 as if this were out-of-state service of process, the appropriate sections of the Illinois Civil Practice Act are Sections 13.1 and 13.3.

(2) Sections 13.1 and 13.3 allow summons to be served on any private corporation by serving a copy of the process on any "agent" of the corporation found anywhere in the State. Such in-state service may be effected on either a domestic or foreign corporation; and regarding foreign corporations, no distinction is made between those that have qualified to do business, appointing a registered agent for service of process, and those that do some business in the state without qualifying. Consolidated Cosmetics v. D-A Pub. Co., 186 F.2d 906 (7 Cir. 1951); Johnson v. Hanover Fire Insurance Co., 15 F. 97 (D.C.Ill.1883); Phillips v. Interstate Motor Freight System, 45 F.Supp. 1 (E.D.Ill.1942); Canright v. General Finance Corporation, 33 F.Supp. 241 (E.D.Ill.1940); Craig v. Sullivan Mach. Co., 344 Ill. 334, 176 N.E. 353 (1931); Hall v. Metropolitan Life Ins. Co., 298 Ill.App. 83, 18 N.E.2d 388 (1938).

Due process of law, however, requires that a foreign corporation served with process in Illinois under Section 13.3 " * * * have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). Illinois courts have typically construed "fair play" to require that the foreign corporation so served must be *doing some amount of business in Illinois*.

Three recent Seventh Circuit cases are instructive. In Riverbank Laboratories v. Hardwood Products Corp., 220 F.2d 465 (1955), the Seventh Circuit, following its decisions in two earlier cases, Roberts v. Evans Case Co., 218 F.2d 893 (1955), and Canvas Fabricators, Inc., v. William E. Hooper & Sons Co., 199 F.2d 485 (1952), held that the defendant was not doing business in Illinois, and therefore its motion to dismiss should have been granted. In Riverbank the defendant was a non-resident corporation, not licensed to do business in Illinois, nor had it authorized an agent for service of process there. Defendant maintained a sales office in Illinois, where service of process was made, for the purpose of soliciting orders for goods manufactured by defendant in Wisconsin. Sales orders were transmitted to Wisconsin for acceptance or rejection. Defendant's name appeared

on the door of its Chicago office, and also in the Chicago Telephone directory. The District Court upheld service of summons on the defendant's salesman in charge of its Chicago sales office under the predecessor to Section 13.3 of the Civil Practice Act.

In Canvas Fabricators, the defendant's Chicago-based sales representative also used stationery bearing the defendant's name and address of the Chicago office, and the defendant maintained a Chicago bank account where it had deposited the plaintiff's checks for the purchase of merchandise. In Roberts, in addition to fitting all of the facts above describing Riverbank and Canvas Fabricators, the defendant filed a personal property schedule with the Assessor of Cook County, Illinois, for "merchandise on hand."

The Seventh Circuit refused to distinguish its prior holdings because of the additional facts that the defendant in Riverbank received royalty payments as the licensor of its product in Illinois, and that the Chicago-based sales representative investigated complaints concerning the functioning of defendant's products in Illinois. The Court held that:

" * * * [t]he law of Illinois must control and that decisions by the Illinois Supreme Court * * * establish the rule that a defendant is not subject to process in Illinois if it was not engaged in business in that state in any way other than the solicitation of orders to be accepted or rejected elsewhere." (Ibid., 220 F.2d, at p. 467.)

The Supreme Court of the United States reversed Riverbank in a terse *per curiam* opinion: "The Court is of the opinion that the District Court correctly found there was proper service upon the defendant in this case." (350 U.S. 1003, 76 S.Ct. 648, 100 L.Ed. 866 (1956).) Since the Supreme Court gave no reasons for its reversal, one can only speculate as to the error in the Seventh Circuit. A reasonable presumption is that the Court of Appeals erred in its failure to give proper regard to the District Court's finding that the Chicago salesman, who was served with process, investigated complaints of customers in addition to soliciting orders, since this fact was absent in the two earlier Seventh Circuit cases. In any event, this fact would constitute one of those "sufficient additional activities" mentioned in International Shoe, 326 U.S. 310, 314, 66 S.Ct. 154, 90 L.Ed. 95, which when added to regular and systematic solicitation of orders in a state, render a foreign corporation amenable to service of process.

Here there is no doubt that the Hoover Ball salesmen stationed at the Midwest Zone sales office located in Chicago regularly and systematically solicited orders for acceptance by Hoover Ball in Michigan. Depositions of four of the salesmen at the Chicago office establish the following additional activities in Illinois (although it is not established quantitatively how substantial the activities are):

(1) McGregor testified that the salesmen are equipped to give engineering advice to customers regarding simple calculations of loads and stresses on Hoover Ball products.

(2) McGregor testified that typically when a customer would call the Chicago office to report a bearing that was not giving proper service, one of the salesmen would suggest something like a change of lubricant to the customer.

(3) McGregor testified to having displayed samples of Hoover Ball products at the Design Engineers Show at McCormick Place, Chicago, in the spring of 1962.

(4) Lawrence testified that he handled a complaint by a customer in Chicago concerning a ball which the customer had rejected because of a pit in it.

(5) Lawrence testified that he personally attended the Design Engineers Show at McCormick Place, Chicago, during its entire three days in June, 1962.

(6) Merren testified that he assisted the engineers employed by cus-

tomers of Hoover Ball in the design, selection and proper application of bearings.

(7) Merren testified that when he received a complaint from a customer he submitted a report to McGregor and then returned to the customer with a solution if it lay within his technical understanding.

(8) Maschek testified that he confers with Hoover Ball customers regarding their complaints.

(9) Maschek testified that as the Chicago representative of Hoover Ball, he worked at the Home Builders Show at McCormick Place, Chicago, for five days in December, 1961, where he had a booth displaying the Hoover Ball products.

These additional contacts with Illinois are sufficient to sustain service of process under Section 13.3. The Seventh Circuit in Riverbank stated it was governed by Illinois law in testing the validity of service of process, and cited Booz v. Texas and Pacific Railway Co., 250 Ill. 376, 95 N.E. 460 (1911), in support of the proposition that solicitation of orders for acceptance outside Illinois is insufficient contact with Illinois. It did not mention American Hide & Leather Co. v. Southern Railway Co., 310 Ill. 524, 529, 142 N.E. 200 (1924), which expressly distinguished Booz. In American Hide, service on the defendant, which maintained an office and track in Illinois, was made on an employee of the defendant, employed to solicit freight orders for the defendant's acceptance elsewhere:

"He was not employed as soliciting agent for any other company. He made no contracts on behalf of defendant, issued no bills of lading, sold no tickets, and collected no money for defendant." (Id. 310 Ill. at p. 528, 142 N.E. at p. 201.)

In Booz, service was made on a purported "agent" of the defendant, which maintained neither track nor office in Illinois, who was employed by two independent contractors who represented several foreign railroads and solicited orders for all of them. I think the jurisdictional facts of the case at bar fit American Hide more closely than Booz.

Other pertinent authorities on Illinois law lead to the same conclusion. Pergl v. United States Axle Co., 320 Ill.App. 115, 50 N.E.2d 115 (1943), sustained jurisdiction over a foreign corporation, which was served through a local warehouse company which solicited orders for the defendant, on the ground that, in addition to continuous solicitation of orders and shipment of goods into Illinois, there was a stock of goods maintained in Illinois from which customers were sold. (The depositions in the case at bar establish that the salesmen maintained samples of Hoover Ball products in Illinois from which customers were sold.)

Olshansky v. Thyer Mfg. Corp., 13 F.R.D. 227 (N.D.Ill.1952), relying on the Booz case, held service on the employee of an independent contractor, who solicited orders in Illinois for several corporations' out-of-state acceptance, was insufficient. The District Court emphasized that the independent contractor had no authority to place the name of the defendant on the door of her office (for which she paid her own rent) or in any telephone directories. (There is no question in the case at bar that the person served was an employee of the defendant, using an office maintained as the defendant's Chicago office and at the defendant's expense.)

Further, as regards the attendance of defendant's salesmen at business conventions in McCormick Place, Chicago, Scene-In-Action Corp. v. Knights of Ku-Klux-Klan, 261 Ill.App. 153 (1931), indicates that this is an important contact with Illinois for purposes of testing validity of service:

"The question whether the holding of a general convention by a foreign corporation constitutes 'doing business' within the meaning of the rule here under consideration, is one upon which we have been unable to find authority. * * * Our opinion is that after defendant had sent its agent into the State of Illinois to

hold a general convention, which is in the exercise of its charter powers, it is not in a position to say that it has never been in the State of Illinois, and we hold that the service made in this case gave the court jurisdiction over defendant." (Id. 261 Ill.App. at p. 158.)

Finally, it must be noted that as a matter of common sense "doing business" does not consist solely of the final act of business, i. e. consummating a deal by a sale. Customers must be solicited, sold, pacified when dissatisfied with the product purchased, and constantly advised in the use of the product in order to retain their patronage, in addition to the myriad other activities connected with the manufacture and distribution of a product. That Hoover Ball has been "doing business" in Illinois in this sense is demonstrated in Consolidated Cosmetics v. D-A Pub. Co., 186 F.2d 906 (7 Cir. 1951). That case involved service on the defendant, who edited a magazine in New York, in Illinois through its agent which was selected to print the magazine in Illinois in order to qualify for second-class mailing privileges. The Court said:

"The functions of a magazine publishing company, obviously, include gathering material to be printed, obtaining advertisers and subscribers, printing, selling and delivering the magazines for sale. Each of these, we think, constitutes an essential factor of the magazine publication business. Consequently if a non-resident corporation sees fit to perform any one of those essential functions in a given jurisdiction, it necessarily follows that it is conducting its activities in such a manner as to be subject to jurisdiction." (Id. 186 F.2d at p. 908.)

It is interesting to note that while Section 17 expressly limits jurisdiction of Illinois courts, obtained under its provisions for *out-of-state* service of process, to "[o]nly causes of action arising from acts enumerated" therein, Section 13 contains no such limitation. Subsection (4) of Section 17 (see footnote 2 above) pre-

serves the right to use any other manner of service of process on non-resident defendants authorized by law. Thus, even though Hoover Ball's business in Illinois was not transacted with Magnaflux, *in-state* service of process under Section 13.3 may still be sustained. I find that the service of summons on Hoover Ball is sufficient to satisfy both the tests of Section 13.3 of the Illinois Civil Practice Act and the due process clause of the United States Constitution.

### Forster/Hoover

■ Forster/Hoover is a Michigan corporation. It was served in Illinois by service of summons on its vice-president, one Norman H. Sonderman, who is an Illinois resident. Mr. Sonderman was served at his home in Lake Zurich, Illinois.

Forster/Hoover carries on all of its activities in the State of Michigan, with the exception of some activities in Illinois by Sonderman. Although plaintiff alleges and argues that Forster/Hoover uses the office of Hoover Ball at 8581 South Chicago Ave., in Chicago, Illinois, the affidavits filed by Forster/Hoover clearly refute this charge, and plaintiff's affidavits do not challenge Forster/Hoover on this point at all.

*Forster/Hoover's contacts with Illinois are as follows:*

(1) Sonderman, Forster/Hoover's vice president, lives in Illinois and has spent 15% of his working time for Forster/Hoover in Illinois.

(2) Sonderman has the authority to accept orders for the sale of Forster/Hoover products.

(3) Sonderman admits to having obtained two orders for Forster/Hoover equipment from Illinois customers.

(4) Plaintiff has filed an affidavit by one James E. Harrer, a field engineer employed by Magnaflux in the Chicago metropolitan area. The affiant states, on the basis of hearsay information which he has obtained, that Sonderman has made numerous calls on customers of Magnaflux with whom he may have for-

merly done business during his fourteen years with Magnaflux. During these calls he demonstrated Forster/Hoover equipment and sought to build good will for his company and to harm the customer relations of plaintiff. Forster/Hoover does not deny these remarks by affidavit but merely states that they are hearsay and should be disregarded for that reason. Since the Harrer affidavit has not been denied, if he is to be believed, Sonderman's calls on Magnaflux's customers in Illinois amount to overt acts by Forster/Hoover in furtherance of the conspiracy alleged in the complaint.

(5) The same Harrer affidavit states that on one occasion in July, 1962, Dr. Foerster's son and business associate, Martin Foerster, arrived in this country for training with Forster/Hoover, and that he was taken by Sonderman on customer calls in Illinois.

Again, Forster/Hoover does not contradict the charges in this affidavit, and if they are to be believed, Sonderman was providing training for an employee of Forster/Hoover's business partner and fellow conspirator, Dr. Friedrich Foerster.

These acts would amount to inducement of Foerster within the State of Illinois to breach the contract between Foerster and Magnaflux under which Magnaflux was granted exclusive sales rights to Foerster's products.

### Opinion

Plaintiff's argument is directed, as it was in the case of Hoover Ball, to establishing that the service of process on Forster/Hoover by personally serving Sonderman, its vice-president, in Illinois, was proper because Forster/Hoover was "doing business" and "transacting business" in Illinois. The return of service is identical to that quoted above regarding Hoover Ball, with the exception that "Forster/Hoover Electronics" and "Mr. Norman Sonderman" appear in the appropriate blanks.

As for both of these contentions, the same reasoning would apply to Forster/Hoover as to Hoover Ball above.

Sonderman's admissions that he spends 15% of his working time for Forster/Hoover in Illinois, that he has authority to accept orders for the sale of Forster/Hoover products and that he has obtained at least two such orders from Illinois customers, are sufficient to satisfy the requirements of Section 13.3.

In addition, since Forster/Hoover is alleged to have committed a tort in Illinois by engaging in a conspiracy to induce Foerster to breach his contract with Magnaflux, the case of Cannata v. White Owl Express, Inc., 339 Ill.App. 79, 89 N.E.2d 56, is in point. There in-state service of process, under the predecessor of Section 13.3, on the truck driver who killed the plaintiff's deceased was held sufficient to obtain jurisdiction over the foreign corporation in a wrongful death action.

Even if service on Forster/Hoover had been made out-of-state and thus Section 17 were to be controlling, as the parties erroneously assume in their briefs, plaintiff has alleged, shown by affidavit and argued in its briefs that Forster/Hoover also committed tortious acts in Illinois, to-wit: Forster/Hoover's vice-president Sonderman is alleged to have done overt acts in furtherance of the conspiracy to induce Foerster to breach his contract with Magnaflux. I think that these contacts with Illinois are sufficient to bring Section 17(1) (b) into play and to give the Court jurisdiction over the person of Forster/Hoover as a non-resident tort feasor who committed the tort of conspiracy to induce the breach of contract out of which the cause of action here arose in Illinois. See Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957), and Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961).

In the Nelson case, jurisdiction over a Wisconsin corporation was upheld on the theory that it had committed a tort in Illinois when its employee, while delivering an appliance purchased in Wisconsin to the purchaser's home in Illinois, negligently let the appliance slip and fall upon the hand of the plaintiff in Illinois.

In the Gray case, the most recent opinion of the Illinois Supreme Court on the interpretation of Section 17 of the Illinois Civil Practice Act, an Ohio corporation was held to have submitted to the jurisdiction of Illinois courts by committing a tortious act in the State of Illinois. The Ohio corporation manufactured in Ohio a safety valve which it sold to a Pennsylvania corporation; the Pennsylvania corporation incorporated the valve in a water heater which it manufactured in Pennsylvania, and then sold the finished product. The plaintiff who purchased the finished product was injured in Illinois, and alleged that his injuries were due to the negligent manufacture of the safety valve by the Ohio corporation. Both of these cases are adequate authority to establish the propriety of personal jurisdiction over a non-resident defendant whose agent commits a tortious act in the State of Illinois.

I find that under either the "doing business" tests of Section 13.3 for in-state service of process, or "tort" tests of Section 17(1) (b) for out-of-state service of process, jurisdiction over Forster/Hoover has been established, and further that such conduct amounted to sufficient minimal contact with the State of Illinois to satisfy the due process clause of the United States Constitution.

### Hentschel

Hentschel is a vice-president of Forster/Hoover. He was served under Section 17 of the Illinois Civil Practice Act at his home in Ann Arbor, Michigan, by leaving a copy of the summons and complaint with his sister, who was a member of his household. The theory of the plaintiff for upholding service is that Hentschel "transacted business" in Illinois and "committed torts" in Illinois.

*The following are Hentschel's contacts with Illinois:*

(1) From December 17, 1956, until June 23, 1961, Hentschel worked as an employee of Magnaflux in Chicago.

(2) Since July 5, 1961, Hentschel has come to Chicago a couple of times on weekend pleasure excursions; and in addition he came to Chicago to participate, either as a vice-president of Forster/Hoover or at the personal request of Dr. Friedrich Foerster, in discussions relating to the performance of the 1954 contract, as amended, between Foerster and Magnaflux. This latter trip to Illinois lasted for two days—March 15 through 16, 1962.

### Opinion

So far as the plaintiff relies on the theory that Hentschel "transacted business" in Illinois to sustain service of summons under Section 17 of the Illinois Civil Practice Act, I think that my previous reasoning regarding Hoover Ball and Forster/Hoover above would require a dismissal of the complaint or a quashing of summons as to this defendant.

Again the cause of action against Hentschel does not arise out of any business which he may have transacted in the State of Illinois but rather depends upon the allegations that he is a co-conspirator in committing the tort of inducing Foerster to breach his contract with Magnaflux.

Insofar as the complaint alleges that Hentschel acted as a co-conspirator with two of the other defendants in a plan designed to induce Foerster to breach his contract with Magnaflux, the jurisdictional issue is whether it has been sufficiently alleged that Hentschel's conduct amounted to the commission of tortious acts *in Illinois*. Can Hentschel's mere attendance at, and participation in, the conference between Foerster and Magnaflux, at the latter's plant in Chicago, on March 15 and 16, 1962, amount without more to the commission of the tort of conspiracy to induce a breach of contract?

Hentschel by affidavit attached to his motion to dismiss denies that he came to the conference as a vice-president of Forster/Hoover. Rather, he states that:

"I did not attend those meetings as Vice-President of Foerster/Hoover. In fact, the Magnaflux people initially objected to my presence on ac-

count of my Foerster/Hoover association. My presence was solely in response to the personal request of Dr. Foerster."

Plaintiff argues that from this statement it should be inferred that the conspiracy must have been pretty well established by March, 1962, if Foerster would not even attend a conference relating to the performance of his contract with Magnaflux without calling in to assist him the employee of a competitor of Magnaflux.

Hentschel continues his affidavit by describing what transpired at the conference in Chicago:

"After a short opening session with the Magnaflux executives, we were turned over to the sales group. This discussion with the sales group was concerned with Magnaflux plans and its comments with respect to Foerster equipment. After that discussion, we continued for the next day and a half with the Magnaflux executives. The subject of the conversations with the executives was Foerster/Hoover and the 1961 contract between Foerster and Magnaflux. We discussed the meaning of and compliance with the 1961 agreement. And the Magnaflux executives asked various questions about Foerster/Hoover."

■ Further, by the affidavit of Wylie D. Reid, a vice-president of Magnaflux, it appears that Hentschel took a rather active part in this conference—at one point attempting to prevent Dr. Foerster from answering questions asked by plaintiff regarding the relationship between Foerster and Forster/Hoover. But are the allegations concerning Hentschel's conduct comparable to the conduct of the defendant's servant in Nelson, supra, in dropping an appliance on the plaintiff's hand in Illinois, or to the conduct of the defendant in Gray, supra, in manufacturing a defective valve which while being used in Illinois caused an explosion which injured the plaintiff? I think not. Plaintiff neither alleges, nor introduces

by way of affidavit, any facts purporting to show how Hentschel's conduct at the Chicago conference was in furtherance of the alleged conspiracy to induce breach of the Foerster-Magnaflux contract. Under the rule of McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), plaintiff must bear the burden of proof of the essential jurisdictional facts whenever the jurisdiction is challenged.

Also, plaintiff argues that other inferences about his conduct in Illinois can be made from Hentschel's admission that he quit his employment with Magnaflux about one week before the amendment to the 1954 agreement was renegotiated in Germany in 1961, and from the fact that Hentschel took employment with Hoover Ball while the negotiations between Magnaflux and Foerster were continuing in Germany in 1961, and from the further fact that Hentschel was made a vice-president of the newly formed Forster/Hoover immediately after it was incorporated.

The difficulty I have with finding these latter facts sufficient to establish jurisdiction over the person of Hentschel is that they are so heavily based upon inference as regards a finding that any of Hentschel's conduct, which is alleged to have been in furtherance of the conspiracy, took place in Illinois. It can be agreed that Hentschel's employment record and his close relationship with Foerster and Hoover Ball suggest that he was conspiring with them, but there is absolutely no evidence by way of affidavit that any of this took place in Illinois. Except for his attendance at the March 15–16, 1962, conference in Chicago, there is no evidence that any of Hentschel's conduct took place in Illinois. Regarding that Chicago conference, I find that the allegations of Magnaflux concerning Hentschel's conduct are insufficient to support the requisite jurisdictional finding that Hentschel committed a tortious act in Illinois.

Accordingly, Hentschel's motion to dismiss the complaint as to him for want of jurisdiction must be granted in that the

allegations of jurisdiction fail to satisfy the requirements of Section 17(1) (b) of the Illinois Civil Practice Act.

I now consider the motions to dismiss the complaint for failure to state a claim upon which relief can be granted filed by the remaining defendants, Dr. Foerster, Hoover Ball and Forster/Hoover.

The crux of the matter is, as the defendants' motion succinctly states:

"The complaint stands or falls on a single proposition which is that Forster/Hoover is not a 'Foerster Group' as that expression is used in the 1961 agreement. Everything else is ancillary or subordinate to that proposition."

Perhaps it is well before considering this motion to review · briefly what is charged in the complaint.

Dr. Friedrich Foerster is charged with a breach of his 1954 contract, as amended in 1961, with Magnaflux in that contrary to his promise not to sell Foerster instruments in the United States or Canada, except directly or *through* a "Forster group," as defined in the contract, he has in fact sold his products *to* Forster/Hoover, which does not qualify as a "Forster group" as defined.

A "Forster group" is defined as:

"1. An employee of Institut Dr. Friedrich Forster (or a group of such employees) located and operating in the United States;

"2. A corporation organized and operating in the United States sufficient of the voting stock of which is owned by Institut Dr. Friedrich Forster or by Dr. Friedrich Forster or by the heirs, executors or personal representatives of Dr. Friedrich Forster to enable such owner to elect at least a majority of the directors of such corporation."

The Articles of Incorporation of Forster/Hoover Electronics, Inc., are appended to the complaint as Exhibit A. They provide that the corporation shall have a total authorized capital stock of 20,000 Class A Common shares of a par value of $1. and 82,000 Class B Common shares of a par value of $1. Further, it is provided that, "The Class A Common Stock and the Class B Common Stock shall have equal privileges, preferences and rights, except that until January 1, 1965 the Class A Common Stock shall have exclusive voting power with respect to the election of directors. Effective on January 1, 1965, the Class A Common Stock and the Class B Common Stock shall have equal privileges, preferences, rights and voting powers, without distinction."

The Articles further provide that Friedrich Foerster owns 10,200 shares of Class A and that Hoover Ball owns 9,800 shares of Class A Common Stock; Foerster owns none of Class B, while Hoover Ball owns 71,800 Class B shares, Norman Sonderman owns 5,100 of the Class B shares and Rudolph Hentschel owns 5,100 of the Class B shares.

The complaint alleges on information and belief that there have been no transfers of stock since the original subscription outlined above in the Articles of Incorporation, and the same parties still own the same percentages of the two classes of stock.

The contract between Foerster and Magnaflux expires on December 31, 1964, provided that a notice of termination is given at least one year prior to that date. So that it appears, and plaintiff so alleges, that the temporary suspension of the voting rights in the Class B Common Stock until January 1, 1965, was designed to give Foerster voting control of the corporation only as long as he was contractually bound not to sell his products through any corporation other than a "Forster group."

It is clear that after January 1, 1965, Hoover Ball will have the voting control of Forster/Hoover by a comfortably wide margin.

Forster/Hoover is alleged, in brief, to have induced Foerster to breach his contract with Magnaflux by acting in concert with its co-conspirators, Hoover Ball and Rudolph Hentschel. The complaint alleges that in addition to breaching his

contractual obligation to sell his products in the United States only through a "Forster group," defendant Foerster was guilty of fraud in the inducement of the 1961 amendments to the 1954 contract, in that, "At no time during the July 1961 negotiations did Foerster or his representatives state that he had made any plans or arrangements to sell his products in the United States. During these negotiations Foerster expressly denied that he had any arrangement whatever with anyone other than Magnaflux to sell or manufacture his instruments in the United States." (Paragraph 34)

Further, "Foerster concealed from Magnaflux during said negotiations of July 1961, that he had previously negotiated with Hoover Ball to supersede Magnaflux as his exclusive representative in the United States for the sale and distribution of Foerster type equipment. When Foerster executed the 1961 agreement he intended to immediately join Hoover Ball in organizing a new corporation to sell and manufacture Foerster type instruments in the United States." (Paragraph 37)

The succeeding paragraphs of the complaint allege that Hoover Ball induced Foerster beginning prior to July 14, 1961, to terminate his business relations with Magnaflux at the first opportunity and to divert all or as much as possible of Foerster's American business from Magnaflux to Hoover Ball and the subsidiary Hoover Ball proposed to form for that purpose. Sonderman and Hentschel, officers and directors of the firm to be organized as Forster/Hoover, and former employees of the plaintiff Magnaflux, are alleged to have been brought into this conspiracy, and all of them are alleged to have conspired to deprive Magnaflux of its lawful rights under the 1954 contract as amended in 1961. (Paragraph 38)

It is also alleged that, "Forster/Hoover entered into a secret contract with Foerster for the sale and distribution of Foerster instruments and parts therefor and for the manufacture of Foerster type instruments by Forster/Hoover. This se-

cret contract also regulates other matters between Forster/Hoover and Foerster and directly or indirectly aids Hoover Ball in the maintenance of its control over the business of defendant Forster/Hoover. Defendants have refused to disclose to plaintiff this secret contract or any of the provisions thereof or any of the amendments or supplements thereto or any of the correspondence relating thereto, and plaintiff will remain ignorant thereof unless aided by the discovery procedures of this Court." (Paragraph 41)

Plaintiff alleges alternatively that even if Forster/Hoover were a "Forster group," which plaintiff does not concede for a moment, Foerster has further breached his contract with Magnaflux in that under paragraph 2 F. of the 1954 agreement, as amended, Foerster had the duty to notify Magnaflux promptly of any installation of any new or improved Foerster instruments in the United States or Canada, and Magnaflux was to have the right to visit such installation and discuss it with Foerster or the "Forster group." The complaint further charges that Foerster has made such installations through Forster/Hoover, and that notwithstanding his contractual duty of notification, Foerster has failed to supply any information in regard to such installations, or to discuss any of the equipment installed by Forster/Hoover. Further, Foerster is alleged to have violated paragraph 4 of the 1954 contract, which provides that when Foerster instruments are sold through a "Forster group," that they must be sold at a discount of at least 50% below that price to Magnaflux.

There are a variety of other ancillary breaches also alleged.

In short then, the complaint alleges a breach of his contractual duties by Foerster in that Foerster either is selling his products through a corporation which is not a "Forster group," or if he is selling through a "Forster group," he has not properly notified plaintiff of such sales nor has he given plaintiff the 50% dis-

count below the price at which sales are made through such "Forster group." The complaint further alleges that Forster/Hoover, along with the other two alleged co-conspirators, conspired to induce Foerster to make the above-described breaches of his contract with Magnaflux.

The gist of the defendants' argument that a claim has not been stated against them is that no breach of contract is alleged because on the face of the complaint and on the face of the contract appended thereto, Forster/Hoover is a "Forster group."

■ There is no doubt that the Illinois law is that to state a claim alleging inducement to breaching a contract, the following elements are essential: (1) Defendant's knowledge of the existing contract; (2) inducement of one of the parties to the contract to breach it; (3) subsequent breach by one of the parties; and (4) damage to the plaintiff. See Northern Ins. Co. of New York v. Doctor, 23 Ill.App.2d 225, 161 N.E.2d 867, and Hardy v. Bankers Life & Casualty Co., 19 Ill.App.2d 75, 153 N.E.2d 269.

■ To sustain either the claim for breach of contract against Foerster, or the claim for conspiracy to induce a breach of contract against Hoover Ball and Forster/Hoover, Magnaflux must allege a breach of the 1954 agreement, as amended in 1961. The question is, therefore, whether Magnaflux has sufficiently pleaded a breach of that contract by alleging Forster/Hoover is not such a "Forster group," as contemplated by the parties to the agreement, through which Foerster could legitimately sell his products independently of Magnaflux. The answer to this question is not as simple as defendants assert it to be.

It is uncontradicted that until January 1, 1965, Foerster will have sufficient control of the "voting stock" of Forster/Hoover to enable him to elect a majority of directors. However, Magnaflux argues that it was intended by the parties that control of the voting stock should be "permanent and not temporary." Defendants contend that however temporary Foerster's voting control might be, it is at least as long as his contractual obligations with Magnaflux; and, therefore, since the contract between Foerster and Magnaflux gives no rights whatsoever after its termination on December 31, 1964, Foerster's loss of voting control *after* that date should have no bearing on this case at all.

Both parties seek to introduce by way of their briefs statements as to what the respective intentions of the parties were during the 1961 negotiations. Magnaflux argues that the intention of the parties was that a "Forster group" be permanently controlled by Foerster in order to qualify. Foerster, Hoover Ball and Forster/Hoover contend that it was the intention of Magnaflux to make the 1961 amendments "for tax purposes," although this is not further amplified. Both sides also accordingly assert that the parol evidence rule should bar consideration of the other side's statement as to what its intentions were at the time of integrating their agreement in a written contract on July 14, 1961.

■ The rule, of course, is when a contract has been integrated and reduced to writing prior or contemporaneous oral statements of intention by the parties are irrelevant and cannot be considered by the court in interpreting that contract, *when the contract terms are not ambiguous or uncertain.* See, among others, Oddie v. Ross Gear & Tool Co., 305 F.2d 143, 148 (6 Cir. 1962), Standard Oil Co. v. Ogden and Moffett Co., 242 F.2d 287, 292 (6 Cir. 1957), and The Restatement of Contracts, (1932) § 237.

However, the crucial point in the operation of the parol evidence rule is that the contract terms must be *unambiguous.*

Agreements prior to or contemporaneous with the integration are admissible in evidence to establish the meaning of the integrated contract when its terms are ambiguous or to prove facts in a suit for reformation. See Restatement of Contracts, §§ 230, 231 and 238 (a) and (c).

In Martindell v. Lake Shore Nat. Bank, 15 Ill.2d 272, 154 N.E.2d 683 (1958), in answer to a complaint for specific performance of a contract of sale of "Who's Who," the defendants sought to justify their refusal to sell by asserting a narrow construction of the contract, emphasizing one clause of the contract over all others. The contract gave the plaintiff the option to purchase 67% of certain corporate debentures ten years after they were issued by the new corporation which was formed as part of the sale. In apparent limitation of plaintiff's option rights, the clause on which defendants relied stated: " 'Debentures paid and discharged by the new corporation shall not thereafter be available for purchase by the Buyer under this option.' " If one of the sellers (Wheeler Sammons, Sr.) died before ten years elapsed, a clause further provided for acceleration of the election date for plaintiff's option to a date coincidental with issuance of letters in his estate. Sammons, Sr., died and on the same day that letters were issued in his estate, the other defendants caused the "new corporation" to redeem the debentures outstanding. The issue was whether the above-quoted clause limiting plaintiff's option rights was intended by the parties to the contract to have the same limiting effect even after the date for plaintiff's election had been accelerated.

The Illinois Supreme Court upheld the trial court's summary judgment for the plaintiff, granting a decree of specific performance of the contract, and in so doing considered evidence of negotiations prior to the integration of the agreement in a writing. Among the evidence extrinsic to the written contract itself which the trial court considered were letters written by Sammons, Sr., prior to the formal execution in which he indicated that he wanted plaintiff to be his successor:

"A contract, however, is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, since it will be presumed that everything in the contract was inserted deliberately and for a purpose. Hartley v. Red Ball Transit Co., 344 Ill. 534, 176 N.E. 751. The intention of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself, but each part of the instrument should be viewed in the light of the other parts. Chicago Home for Girls v. Carr, 300 Ill. 478, 133 N.E. 344; 12 I.L.P., Contracts, § 215.

"The primary object of the construction of a contract is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to any particular words used in expression thereof. United States Trust Co. of New York v. Jones, 414 Ill. 265, 111 N.E.2d 144; Guhl v. Guhl, 376 Ill. 100, 33 N.E.2d 185; 12 I.L.P., Contracts, § 212. In general, the intention of the parties is to be determined from the final agreement executed by them, rather than from preliminary negotiations and agreements (Clark v. Mallory, 185 Ill. 227, 56 N.E. 1099) but previous agreements, negotiations and circumstances may be considered in determining the meaning of specific words and clauses. Koelmel v. Kaelin, 374 Ill. 204, 29 N.E.2d 106; 12 I.L.P., Contracts, § 215. Similarly, under well recognized exceptions to the parol evidence rule, extrinsic evidence is admissible to show the meaning of words used in a contract where there is an ambiguity, or when the language is susceptible of more than one meaning. Adams v. Gordon, 265 Ill. 87, 106 N.E. 517; Evans v. Gerry, 174 Ill. 595, 51 N.E. 615; Hogan v. Wallace, 166 Ill. 328, 46 N.E. 1136; Restatement of Contracts, sec. 238(a)." (Id. 15 Ill.2d at pp. 283–284, 154 N.E.2d at p. 689.)

Is "voting stock" such an ambiguous term? Other courts in other contexts have found it so. Although involving an admittedly distinguishable question, in problems of Federal taxation of corporations, two courts have considered the

term "voting stock" and found it not to be without ambiguity. Wurlitzer Co. v. Commissioner of Internal Revenue, 81 F.2d 971 (6 Cir. 1936), and Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942).

Here it is not clear on the face of the 1954 agreement, as amended, that when the parties provided that Foerster should own "sufficient of the voting stock" of a corporation in order "to elect at least a majority of the directors of such corporation," what they would have thought of a corporate capitalization in which Foerster owned 51% of the voting stock but only for a period of some two and one-half years. One could also speculate as to what the parties would have thought of a corporation in which Foerster was only one of five directors, and the other four were employees of a competitor of Magnaflux, which is the case with the Forster/Hoover corporation.

Further, paragraph 14 of the 1954 agreement, as amended by paragraph M. in 1961, provides:

"This agreement as amended shall run for a first term to and including December 31, 1964, and shall be renewed automatically from year to year thereafter, provided, however, that either party may terminate this agreement on the 31st day of December in the year 1964 or in any year thereafter by written notice to the other party at least one year before the desired effective date of termination."

Thus, at the time the contract was originally executed, and later at the time of its amendment in 1961, the parties were not certain of the length of the contract's life. Under the automatic year-to-year renewal clause, the contract could have continued Magnaflux's modified exclusive sales rights beyond December 31, 1964, as long as a termination notice was not given at least one year before that date. The same is true today, as the record is barren of any evidence that either party has given such notice. Under these circumstances, it is difficult to understand how Forster/Hoover's capital structure could satisfy the test of a "Forster group" should the present contract be automatically renewed. Dr. Foerster's 51% control of the voting stock expires according to the Articles of Incorporation on December 31, 1964, at which time Hoover Ball will possess more than 80% of the voting stock. Consequently, Dr. Foerster may not even have voting control of Forster/Hoover during the life of his agreement with Magnaflux.

The possibility that Foerster entered into a contract to sell his products to or through a corporation, a majority of whose voting stock he might not control during the period of his contractual obligation to Magnaflux, when considered with the plaintiff's allegation that Foerster fraudulently induced the execution of the 1961 amendments to the 1954 agreement by concealing from Magnaflux his dealings with Hentschel and Hoover Ball and his intention to create with them Forster/Hoover, raises substantial questions of fact regarding Foerster's good faith in performing under the contract.

It is interesting to note that the Court held in Martindell that Illinois law implies obligations of good faith and fair dealing from all parties to a contract:

"When the instrument is construed in light of all its provisions and with a view to the intent to be gathered from the extrinsic evidence, we cannot agree that the limiting sentence in the option provision was intended by the parties to reduce the agreement to a security arrangement or to shrink the rights expressly granted plaintiff to the status of an offer revocable at the pleasure of the new corporation. Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. 12 I.L.P., Contracts, § 217. In the present case the only limitation on plain-

tiff's option to purchase is that debentures 'paid and discharged by the new corporation' would not thereafter be available for purchase under his option. From the entire record, it is our opinion that this limitation has reference only to *bona fide* redemptions made by the corporation in the normal course of business. Otherwise, as is demonstrated by the result reached in the Appellate Court, the new corporation, even though it was not a party to the agreement, must be said to have remained in a position to accomplish a complete forfeiture of plaintiff's rights even after the time to exercise such rights had been reached. Most certainly no concept of good faith or fair dealing permits a construction that the limitation was intended to reach corporate redemptions financed by the sellers for the sole purpose of avoiding the plaintiff's options rights." (Id. 15 Ill.2d at p. 286, 154 N.E.2d at p. 690.)

Evidence will be required to determine whether Forster/Hoover qualifies as a "Forster group" as defined by the contract itself. I am not satisfied with the sufficiency of the affidavits before me to decide this question on summary judgment, as did the Illinois Court in Martindell. Moreover, defendants' motions ignore the allegations of other breaches of the contract (alleged in the alternative, should Forster/Hoover be found to be a "Forster group"), described above, which will also require the reception of more evidence.

Therefore, it would appear that plaintiff has sufficiently pleaded ultimate facts alleging a breach of its contract with Foerster. Whether the term "voting stock" is considered ambiguous, and plaintiff is correspondingly allowed to introduce parol evidence to explain the term, or whether plaintiff relies upon its allegations of fraudulent inducement of the contract by Foerster, it cannot be said as a matter of law that plaintiff has not stated a claim upon which relief can be granted. Further, as regards plaintiff's allegations that Forster/Hoover in conspiracy with two others induced Foerster to make this breach of contract, it would also appear that all the elements required for stating a claim for inducement to breach a contract have been stated.

Accordingly, the motion of the defendants, Dr. Friedrich Foerster, Hoover Ball and Bearing Company and Forster/Hoover Electronics, Inc., to dismiss the complaint for failure to state a claim upon which relief can be granted is denied.

Therefore, it is the conclusion of this Court that:

(1) The motion of Dr. Friedrich Foerster to dismiss the complaint for want of jurisdiction over his person is denied.

(2) The motion of Forster/Hoover Electronics, Inc., to dismiss the complaint for want of jurisdiction over its person is denied.

(3) The motion of Hoover Ball and Bearing Company to dismiss the complaint for want of jurisdiction over its person is denied.

(4) The motion of Rudolph G. Hentschel to dismiss the complaint for want of jurisdiction over his person is granted.

(5) The motion of Rudolph G. Hentschel to dismiss the complaint for failure to state a claim on which relief can be granted is moot, the complaint having been dismissed for lack of jurisdiction over his person.

(6) The motion of Dr. Friedrich Foerster, Hoover Ball and Bearing Company and Forster/Hoover Electronics, Inc., to dismiss the complaint for failure to state a claim upon which relief can be granted is denied.

(7) Defendants, Dr. Friedrich Foerster, Hoover Ball and Bearing Company and Forster/Hoover Electronics Inc., are given twenty days from the date of the receipt of this opinion for filing their answers to the complaint.