**AGRASHELL, INC., Plaintiff,**

v.

**BERNARD SIROTTA COMPANY, Edwin M. Sirotta and Milton A. Sirotta, Defendants and Third-Party Plaintiffs,**

v.

**HAMMONS PRODUCTS COMPANY, Third-Party Defendant.**

No. 63-C-206.

United States District Court
E. D. New York.

May 5, 1964.

 

Albert C. Johnston, New York City, for plaintiff.

Edward Halle, Garden City, N. Y., for defendants and third-party plaintiffs; David F. Cohen, New York City, of counsel.

Lawrence C. Moore, New York City, for third-party defendant.

BARTELS, District Judge.

This is a motion to quash service on the third-party defendant and to dismiss the third-party complaint. Involved is the question whether the acts of the non-domiciliary third-party defendant in relation to the State of New York, fall within the category of transacting "any business within the State" subjecting it to personal jurisdiction within the State pursuant to Section 302 of the Civil Practice Law and Rules.

The original action was commenced by plaintiff Agrashell, Inc., a Delaware corporation, against the defendant Bernard Sirotta Company (a partnership) and its two partners (Sirotta) for infringement of certain patent rights and licenses in selling pelletized black walnut shells within the last six years within the district and elsewhere, as a result of which infringement plaintiff seeks relief by means of injunction, accounting and damages. Thereafter Sirotta, with leave of the court, joined Hammons Products Company, a Missouri corporation, as a third-party defendant, alleging in their complaint that the said walnut shells were purchased by Sirotta from Hammons pursuant to certain warranties and indemnity agreements and that if Sirotta is liable to Agrashell, then Hammons is similarly liable to Sirotta.

## I

The first contact between the parties was a printed circular from Hammons to Sirotta, dated April 30, 1958, advertising Hammons' products and soliciting orders f. o. b. Stockton, Missouri. Sirotta replied on May 2nd requesting best price quotations and samples "in both Truck Load, and Car Load quantities, also state deliveries on your various

grades." On May 15th Hammons quoted car load lots "f. o. b. Bolivar, Missouri" and "f. o. b. Stockton, Missouri".[1] On June 16th, apparently at Sirotta's request, a quantity of black walnut shell samples was delivered to Sirotta by Hammons, via truck, for which there was no charge. On July 2nd Hammons wrote Sirotta again quoting prices per ton f. o. b. Stockton, Missouri. On July 23rd Sirotta entered an order with Hammons for one truckload at a specified price "plus trucking charge not to exceed $1.42 per 100 lbs. delivered to us in Brooklyn NY" and requesting Hammons to do whatever it could "to keep the delivered prices to us as low as possible." The letter contained the following instructions:

"If you can negotiate for a rate lower than $1.42, please do so. We leave that to your discretion. Regarding the trucking company, we cannot use any trucking outfit that might violate any ICC regulations. Since we are not familiar with your trucking arrangements, we would expect you to make all arrangements for your account with the trucking company, and this order is to be delivered to us FOB our door, Brooklyn NY—and you are to assume all responsibility for trucking arrangements. Prepay all freight charges to us so that we have no dealings with the trucking outfit. If you can work out a rate of less than $1.42 cwt, please do so."

In the same letter Sirotta inquired of the trucker's route in case they wished the trucker to drop off material along the way.[2]

On August 6th, pursuant to said order, there was delivered by a private trucker to Sirotta, a quantity of black walnut shells invoiced by Hammons at $1,079.04, which included $1.42 per 100 lbs. freight, the invoice stating that it was "SHIPPED VIA Truck".

■ On November 8th Sirotta ordered another truckload of black walnut shells, stating "Ship via your trucker, as before, freight prepaid to us and bill us FOB our door, as previously" and stating that Sirotta was sending Hammons new 5 ply bags and would arrange "to have a lab in St. Louis do the testing" of the bags.[3]

Following these deliveries to Brooklyn apparently made by independent truckers engaged by Hammons, and also deliveries to other parts of the country at Sirotta's instructions, Sirotta forwarded on December 17, 1958 a blanket purchase order to Hammons for 250 tons of ground black walnut shells, providing for various releases during the year 1959 under f. o. b. terms reading as follows:

"F. O. B. *POINTS* at Purchaser's option:
Stockton, Mo. in Truckload, Less Carload or Less Truckload Lots
Bolivar, Mo. or El Dorado Springs, Mo. in Carload lots"

and containing the following provision:

"Seller to make and route shipments in accordance with instructions from Purchaser.

\*    \*    \*    \*    \*    \*

"Seller agrees to permit inspection at its plant and also to comply with U. S. Government inspection

---

1. In the same letter Hammons stated: "we have checked the car load rates to New York City, which in car load lots is $1.42 plus 3% tax, minimum 40,000#. I believe we could possibly get this trucked for around the same rate but it is doubtful if it could be done any cheaper unless we could find someone who had a back haul. This of course would have possibilities."

2. The inquiry reads: "One more matter— does the trucking outfit you use come to New York via St. Louis—and if so, what could be worked out by way of rate if *we*

*wanted them to drop off some material in St. Louis.* Also find out what general route they take in the event that *we* wanted material dropped off along the route— and what could be worked out along those lines." (Italics supplied.) An indication that the trucker was *indirectly* subject to Sirotta's instructions.

3. This may be construed as appropriation by Sirotta of the shipment when placed in the new bags. See New York Personal Property Law, McKinney's Consol.Laws, c. 41, § 100, Rule 4.

requirements on any Government contracts hereafter made by Purchaser for the sale of these materials." [4]

The order also contained a provision that the seller would save the purchaser harmless against suits involving infringements of United States or Canadian letters patent by reason of the use of the articles ordered and as amended by an amendment dated February 18, 1959, was signed by Sirotta in Brooklyn and accepted by Hammons in Missouri.[5]

Pursuant to the agreement thus formulated, take-downs were requested by Sirotta and shipments with accompanying invoices were made by Hammons, freight prepaid into Brooklyn throughout the year 1959 and part of the year 1960. The first delivery was invoiced February 10, 1959, prior to the amendment to the contract, and the last delivery was on January 14, 1960. There were seven deliveries to Brooklyn under the December contract, totalling about 115 tons out of the 250 tons contracted for, the balance of the goods being delivered outside of New York. The deliveries were made by truckers [6] who were paid by Hammons [7] and the amount of the freight charges was added to the invoice. Thus, including the three deliveries in 1958, there was a total of ten deliveries in Brooklyn of approximately 180 tons of walnut shells, valued at $7,800 with additional charges of $5,700 for freight.[8]

Hammons' affidavits affirmed that it never maintained any agency, salesmen, stock of goods, nor representative to do or transact any business in the State of New York, nor was it ever listed in any telephone book in the State of New York, nor was it authorized or qualified to do business in the State of New York. It further contends that it never transacted any business in the State of New York; that the contract was made in Missouri, and that all material sold and delivered by it to Sirotta was f. o. b. Missouri, at points only in the State of Missouri.

Sirotta contends (1) that the amendment to the contract was made at Hammons' request in Brooklyn (although there is no evidence to support this assertion) and hence was a New York contract, and (2) that the deliveries made in New York pursuant to the contract, were f. o. b. points of delivery and hence were deliveries made by Hammons in New York State.

## II

The New York statute [9] does not spell out with any particularity the meaning of the phrase "transacts any business within the state" and there are no precise standards of measurement to determine the issue. Each case depends on its own particular facts. The principles applicable, however, are derived from the familiar landmark cases of International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; McGee v. International Life

---

4. Inspection at seller's plant is an indication of acceptance at that place. New York Personal Property Law, § 128.

5. The order also contained a paragraph stating: "This agreement shall be construed and interpreted in accordance with the laws of the State of New York" which is considered of no relevance to the jurisdictional problem except in determining when and where ownership in the shipments passed to Sirotta.

6. In one invoice, Exhibit S, the transportation was described as "VIA Refrigerated Express".

7. Except for a reference in a letter by Hammons to "our trucker", there is no

evidence that it owned any truck which made the deliveries.

8. Exhibit V, a letter dated July 21, 1959, requests a truckload "for shipment to us in Brooklyn at $74.40 ton fob our door, Brooklyn, N. Y.", which figure is equal to the charge of $46 a ton plus the standard freight charges of $28.40 a ton.

9. In a diversity action the amenability of a foreign corporation to suit is determined by the law of the State where the court sits. Arrowsmith v. United Press International, 2 Cir. 1963, 320 F.2d 219; Wisconsin Metal & Chemical Corp. v. DeZurik Corp., E.D.Wis.1963, 222 F. Supp. 119.

Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; and Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed. 2d 1283. From them it is now well established that a State may by legislation extend its jurisdiction over foreign corporations without depending upon the inflexible rule of presence as enunciated in Pennoyer v. Neff, 1877, 95 U.S. 714, 24 L.Ed. 565, or the fiction of consent. State jurisdiction may be expanded to subject a foreign corporation to its courts if the corporation has only "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' ". International Shoe Co. v. State of Washington, supra, 326 U.S. p. 316, 66 S.Ct. p. 158, 90 L.Ed. 95. In the last mentioned case it was remarked that while some acts may be insufficient to confer jurisdiction, "other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit" (326 U.S. p. 318, 66 S.Ct. p. 159, 90 L.Ed. 95) and that "the criteria by which we mark the boundary line between those activities which justify the subjection of a cor-

poration to suit, and those which do not, cannot be simply mechanical or quantitative." But Hanson v. Denckla, supra, made it clear that restrictions still remain on the State's personal jurisdiction, stating: "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. * * * it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (357 U.S. p. 253, 78 S.Ct. p. 1239, 2 L.Ed.2d 1283.)

The language of the New York statute is general and there is nothing in its wording which violates the enunciated criteria or the due process clause of the Constitution.[10] The philosophy and purpose of the statute is to afford judicial protection to citizens of the State by providing them with a forum for process against non-residents without subjecting the foreign corporation to unreasonable inconvenience.[11] To determine jurisdiction, the nature of all

10. Cf., Erlanger Mills, Inc. v. Cohoes Fibre Mills, 4 Cir. 1956, 239 F.2d 502, holding the North Carolina statute invalid as applied to the defendant's activities; Fourth Northwestern National Bank of Minneapolis v. Hilson Industries, Inc., 1962, Minn., 264 Minn. 110, 117 N.W. 2d 732, holding Minnesota statute violative of the Fourteenth Amendment as applied to defendants. While the Illinois and New York statutes in referring to "the transaction of any business" do not particularize, other statutes are more specific in enumerating the basis of jurisdiction in contract actions. Minnesota Stat.Ann. § 303.13, subdivision 1(3) and Vermont Stat.Ann. tit. 12, § 855 refer to the entry into a contract with a resident "to be performed in whole or in part by either party" in the State. North Carolina Gen.Stat. § 55–145(3) predicates jurisdiction upon the "production, manufacture, or distribution of goods by such corporation with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed." Wisconsin Stat.Ann. § 262.-05(5) refers to an action which "(c)

Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to deliver or receive within this state or to ship from this state goods, documents of title, or other things of value or * * * (e) Relates to goods, documents of title, or other things of value actually received by the plaintiff in this state from the defendant without regard to where delivery to carrier occurred." Article 23, § 92(d) of the Maryland Code provides for jurisdiction over foreign corporations when sued by Maryland residents on actions "arising out of a contract made within this State or liability incurred for acts done within this State."

11. But minimal contacts and not forum non conveniens is the test. Hanson v. Denckla, supra, 357 U.S. p. 251, 78 S.Ct. 1238, 2 L.Ed.2d 1296. See International Shoe Co. v. State of Washington, supra, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. p. 106; Developments in the Law, State-Court Jurisdiction, 73 Harv.L.Rev. 909, 925 (1960).

the activities of a foreign corporation in connection with the State must be weighed. This includes negotiations, solicitation of orders, contracts, number of shipments, volume of business and any other acts indicating the extent to which the corporation exercised the privilege of acting within the State and enjoying the protection of its laws. This test is wholly unrelated to the traditional and orthodox test of "doing business" within the State which is applied under entirely different circumstances. Tauza v. Susquehanna Coal Co., 1917, 220 N.Y. 259, 115 N.E. 915.[12] The question is whether the statute is being invoked for application to contacts which are insubstantial and insufficient to satisfy the "minimal contacts" standard and hence violative of due process. In general, Hammons' nexus with the State of New York is somewhat amorphous. Whether it meets the "minimal contacts" test depends upon the quality of its activities. The correspondence between the parties is not sufficient for jurisdictional purposes and from the papers submitted it is concluded that the contract, dated December 17, 1958, as amended, was made in Missouri since that was the place where the last act necessary for its formulation was completed. See Fremay, Inc. v. Modern Plastics, 1961, 15 A.D.2d 235, 222 N.Y.S.2d 694. Hammons' real affiliation with the State of New York then depends upon the deliveries to Sirotta in Brooklyn, N. Y. and these are surrounded with ambiguity. Various factual patterns of state contacts appear from the cases but none of the authorities lay down the exact boundary between jurisdictional and nonjurisdictional activities because the test is not mechanical of quantitative. As is well known, the New York statute was modeled from the Illinois statute permitting reference by the Court to Illinois as well as to New York decisions. While a review of the extensive body of law upon the subject would not be particularly fruitful, a reference to some of the cases is pertinent.

For instance, in the following cases jurisdiction was entertained because the contract was made within the State and there were other contacts either before or after the contract was made: National Gas Appliance Corp. v. AB Electrolux, 7 Cir.1959, 270 F.2d 472, cert. denied, 1960, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed. 2d 542; Haas v. Fancher Furniture Company, N.D.Ill.1957, 156 F.Supp. 564; Kropp Forge Co. v. Jawitz, 1962, 37 Ill. App.2d 475, 186 N.E.2d 76; Steele v. DeLeeuw, Sup.Ct.1963, 40 Misc.2d 807, 244 N.Y.S.2d 97. In Patrick Ellam, Inc. v. Nieves, Sup.Ct.1963, 245 N.Y.S.2d 545, the contract alone was deemed sufficient, but in Baughman Manufacturing Co., Inc. v. Hern, 1963, 44 Ill.App.2d 373, 194 N.E.2d 664, a distributorship contract made in the State involving territory outside of the State was deemed insufficient.

In other cases, even though the contract was made outside of the State, certain types of defendant's activities within the State were deemed sufficient to justify jurisdiction. Magnaflux Corporation v. Foerster, N.D.Ill.1963, 223 F.Supp. 552; Wisconsin Metal & Chemical Corp. v. DeZurik Corp., E.D.Wis. 1963, 222 F.Supp. 119 (solicitation alone was deemed sufficient under the single act statute of Wisconsin); see WSAZ, Inc. v. Lyons, 6 Cir.1958, 254 F.2d 242 (construing "doing business" under the Kentucky statute).

Conversely, jurisdiction was rejected where the contract was made outside of the State and the defendant's remaining contacts were insufficient. Kaye-Martin v. Brooks, 7 Cir., 267 F.2d 394, cert. denied, 1959, 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 75; E. Film Corp. v. United Features Syndicate, N.D.Ill.1958, 172 F. Supp. 277; Grobark v. Addo Machine Co., 1959, 16 Ill.2d 426, 158 N.E.2d 73; Saletko v. Willy's Motor, Inc., 1962, 36 Ill.App.2d 7, 183 N.E.2d 569; Irgang

12. Moreover, the test is not to be confused with the "grouping of contacts" test to be applied in determining the law applicable under the conflict of laws doctrine. See Fremay, Inc. v. Modern Plastics, 1961, 15 A.D.2d 235, 222 N.Y.S.2d 694, 698.

v. Pelton & Crane Co., Sup.Ct.1964, 247 N.Y.S.2d 743; Jump v. Duplex Vending Corp., 1964, 41 Misc.2d 950, 246 N.Y.S.2d 864; see Muraco v. Federentino, Sup.Ct. 1964, 247 N.Y.S.2d 598 (purchase from a third-party in New York of goods manufactured by defendant outside of New York, insufficient).

For all practical purposes, therefore, the nature of Hammons' shipments from Missouri to Brooklyn, New York will determine jurisdiction. If the shipments were made by Hammons to Sirotta f. o. b. Missouri, there would be little doubt that Hammons' contacts with New York would fail to meet the "minimal contacts" test as prescribed by due process. In Jump v. Duplex Vending Corp., supra, a national distributor of machines joined as a third-party defendant, shipped merchandise of the approximate value of $250,000 from outside of the State by sight draft to a warehouse in New York where possession was delivered to the third-party plaintiff upon payment of the sums due. The court held that the contacts were insufficient to support jurisdiction, citing Grobark v. Addo Machine Co., supra.

In the Grobark case the defendant executed a distributorship contract with the plaintiff outside of the State of Illinois, appointing plaintiff its exclusive distributor in Chicago. Pursuant thereto, the plaintiff purchased a number of machines from the defendant aggregating in excess of $150,000, by means of orders executed by the defendant in New York. The orders were filled by shipments delivered by the defendant to independent carriers in New York. These contacts were also held insufficient for the acquisition of jurisdiction under the Illinois statute.

There is a possible difference between the Grobark case and the case at bar. The contract here, although originally conceived by Hammons as a contract for shipment f. o. b. Missouri, was finalized as a contract for shipment f. o. b. Brooklyn, N. Y. At the behest of and as an accommodation for the buyer, Hammons engaged the carriers upon condition that Sirotta pay the freight. If the contract is construed as a true f. o. b. destination contract, then delivery of the goods was made to the buyer in Brooklyn.[13] If the contract is construed as an f. o. b. Missouri contract, the term "f. o. b. Brooklyn, N. Y." being used merely to fix the price, then delivery of the goods was made by Hammons in Missouri and Hammons' contacts with the State of New York would have been *de minimis*.[14] One thing is clear—Hammons did not deliver the goods in New York with its own trucks. From all the evidence adduced from the papers, Sirotta has failed to prove that the totality of Hammons' activities including the nature of its shipments satisfied the "minimal contacts" test. This cannot be relegated to the realm of conjecture. When challenged, it was Sirotta's obligation to prove the essential facts in order to establish the Court's jurisdiction. Magnaflux Corporation v. Foerster, supra, 223 F.Supp. at 565. This they failed to do. Under the circumstances the Court finds that there has been no showing that Hammons' activities within the State were of a sufficient qualitative nature as to bring it within the purview of the statute and the jurisdiction of this Court.

In reaching this conclusion the Court is fully aware of the desirability to adjudicate in the same suit, if possible, the claim of the third-party plaintiff against the third-party defendant. How-

---

13. This would ignore the construction that Sirotta appointed Hammons its "ad hoc" agent for shipment purposes.

14. Based upon the background of the negotiations, the contract does not appear to be a true f. o. b. destination contract and the term "f. o. b. Brooklyn, N. Y." meant no more than that the seller was to take charge of the shipment on the buyer's behalf. See United States v. R. P. Andrews & Co., 1907, 207 U.S. 229, 28 S. Ct. 100, 52 L.Ed. 185; N.Y. Personal Property Law, § 127; Kellogg v. Hewitt, 1929, 133 Misc. 609, 233 N.Y.S. 94. The Uniform Commercial Code, § 2–319, provides that "f. o. b." is a delivery term "unless otherwise agreed".

ever strong this policy may be, the Court "does not acquire that jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation." Hanson v. Denckla, supra, 357 U.S. p. 254, 78 S.Ct. p. 1240, 2 L.Ed.2d 1283.

The cause of action alleged against Hammons not arising from the transaction of any business within the State, the motion to quash is granted.

Settle order within ten (10) days on two (2) days' notice.