**TEMCO, INC.**

v.

**GENERAL SCREW PRODUCTS, INC.**

Civ. No. 4546.

United States District Court
M. D. Tennessee,
Nashville Division.

Nov. 29, 1966.

Cornelius, Collins, Neal & Higgins, Nashville, Tenn., for plaintiff.

Trabue, Minick, Sturdivant & Harbison, Nashville, Tenn., and Lindquist, Magnuson & Glennon, Minneapolis, Minn., for defendant.

## ORDER

FRANK GRAY, Jr., District Judge.

This action for alleged breach of contract was originally filed on August 31, 1966, as Rule No. 89170 in the Chancery Court for Davidson County, Tennessee. On September 26, 1966, pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446, defendant removed the action to this court. Temco, Inc. (plaintiff) is a corporation organized under the laws of Tennessee and has its principal place of business in Davidson County, Tennessee. General Screw Products, Inc. (defendant) is a corporation organized under the laws of Wisconsin and has its principal place of business in Wisconsin. The required jurisdictional amount appears on the face of the complaint.

On or about November 1, 1965, plaintiff entered into a contract with the Department of the Army, Ammunition Procurement and Supply Agency, Joliet, Illinois, by the terms of which plaintiff agreed to produce for the Army a certain quantity of artillery shells. On or about November 12, 1965, a sales representative of defendant, residing and doing business in Nashville, approached the plaintiff and offered to perform certain operations which would be necessary under this newly-acquired contract, for a price of $1.06 per unit. This price quotation was submitted on the defendant's stationery and bore the signature of defendant's vice-president, John D. Lehman. On November 19, 1965, Mr. Lehman and defendant's Nashville representative called on plaintiff and submitted another quotation. Again on November 23, 1965, Mr. Lehman and the local representative went to plaintiff's office in Nashville for the purpose of securing a contract. As a result of these negotiations, defendant's original quotation of $1.06 per unit was reduced to $1.03 per unit. There is a question, however, as to whether the actual contract was entered into at this time. On December 9, 1965, plaintiff mailed to defendant a detailed purchase order. The terms of this order called for 175,000 units to be furnished at a unit price of $1.03. The three-page

order also contained a delivery schedule and other information such as specifications, tolerances, and a provision dealing with freight charges. It was also noted that the Aluminum Company of America would furnish extrusions to defendant, and following defendant's work the shells would be shipped to plaintiff's plant in Nashville, Tennessee.

The complaint alleges that defendant breached the contract by failing to carry out its operations according to agreed specifications, and that defendant also failed to meet required delivery schedules. The complaint further alleges that representatives of defendant came to plaintiff on April 21, 1966, and informed plaintiff that the defendant would not continue to perform under the contract. Plaintiff attempted to dissuade defendant from this alleged breach but was unsuccessful and, as a result, plaintiff only received 6,129 of the 175,000 units for which it had originally contracted.

Due to defendant's alleged breach it was necessary for plaintiff to contract the work with another company, but at the rate of $1.20 per unit. In addition to this increased processing expense plaintiff has allegedly incurred increased expenses in transportation, inspection, tooling and also expense for again placing the work and for the delay occasioned by defendant's conduct. For the above the plaintiff alleges damages in excess of $10,000.

On September 26, 1966, defendant filed a motion to dismiss, accompanied by the supporting affidavit of Mr. John D. Lehman, Vice-President of defendant. The motion urged two reasons why it was felt that plaintiff's action was not properly before the court. Defendant's first contention was that the facts presented by this case were simply not meant to have been covered by T.C.A. §§ 20–235 to 20–240, the statutes under which jurisdiction was asserted in the state court. The second reason advanced was that, if these statutes did in fact apply to the defendant in this case, then the statutes are void because in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Under either theory the state court would have had no jurisdiction, and hence neither would this court in a removal proceeding.

Mr. Lehman's affidavit asserts that in June of 1965, John E. Pilkington, doing business as Production Components Company, of Nashville, Tennessee, contacted defendant about acting as its representative for a group of southern states, including Tennessee. On February 3, 1966, although it was dated December 1, 1965, an agreement was executed which appointed Pilkington as exclusive representative for this group of states. The affidavit further asserts that on December 10, 1965, the defendant received at its office in Wisconsin a purchase order for the parts concerning which the parties had been negotiating. The order contained a delivery schedule which was unsatisfactory to the defendant, because at that time it had not received needed raw materials. On December 13, 1965, the defendant received a letter from the plaintiff which contained a revised delivery schedule, the effect of which was to extend defendant's initial delivery time by one month. Mr. Lehman immediately detached the bottom portion of the order, which had printed on it a statement to the effect that acceptance of said purchase order must be shown by signing said detachment and mailing to to plaintiff, and proceeded to follow the instructions thereon.

On the basis of the above facts, it is plaintiff's contention that an oral contract was entered into at the November 23 meeting in Nashville. On the other hand, defendant maintains that there was no contract until it signed the confirmation portion of plaintiff's purchase order on December 13, 1965, in Wisconsin. Defendant's argument is that this signing was the last act necessary to effect a contract, and since it occurred in Wisconsin there are not sufficient contacts with the state of Tennessee to justify the courts of that state in assuming jurisdiction of a dispute arising out of such a contract. Although a determination of where the contract was actually

finally executed would have considerable significance, it would not, standing alone, be dispositive of this motion.

The statute under which the jurisdiction was asserted in this case, T.C.A. § 20–235, is as follows:

"Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:

"(a) The transaction of any business within the state;

"(b) Any tortious act or omission within this state;

"(c) The ownership or possession of any interest in property located within this state;

"(d) Entering into any contract of insurance, indemnity, or guaranty covering any person, property, or risk located within this state at the time of contracting;

"(e) Entering into a contract for services to be rendered or for materials to be furnished in this state.

" 'Person' as used herein shall include corporations and all other entities which would be subject to service or process if present in this state. Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative."

Subsequent statutes set forth the methods which may be employed for service of process. The parties are pretty well in agreement that if the state had jurisdiction it was based on subpart (a) of the statute.

■ Neither the search of the parties nor that of the court has revealed an interpretation of T.C.A. § 20–235 et seq. by the Tennessee courts. Therefore, this court can only apply the law as it feels the Tennessee courts would if faced with the instant set of circumstances.

When interpreting such a statute courts are faced with two problems. The first of these problems is to determine *how much power the state has* to assert jurisdiction over nonresidents who are not personally served within the state. To what extent may the state depart from the teachings of Pennoyer v. Neff, 5 Otto 714, 95 U.S. 714, 24 L.Ed. 565 (1878)? Once that is ascertained there remains the additional problem of deciding to what *degree* did the state assert its legitimate power by enacting this particular statute. Schmidt v. Esquire, Inc., 210 F.2d 908 (7th Cir. 1954). In many instances a state will not exercise all of the power which it has.

■ The power of a state to assert jurisdiction over a person is limited by the due process clause of the Fourteenth Amendment to the United States Constitution, as interpreted by the Supreme Court. In International Shoe Co. v. State of Washington, 326 U.S. 310, 315, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the state's jurisdictional power was stated in the following language: "Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, [5 Otto 714] 95 U.S. 714, 733, 24 L.Ed. 565 [572]. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " [Citations omitted.] Later in that same opinion when speaking about corporations the court said, at p. 317, 66 S.Ct. at p. 158: "Those demands [of due process] may be met by such contacts of the corporation with the state of the forum as make it reasonable,

in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." Still later the court said, at p. 319, 66 S.Ct. at p. 160: "But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." The doctrine of *International Shoe* was, at least, approved in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The trilogy was completed with the court's decision of Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In that case the court noted that the requirements for personal jurisdiction over nonresidents had evolved considerably since *Pennoyer,* but the court also admonished, at page 251, 78 S.Ct. at page 1238, that it would be a "mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." So the basic rule announced in *International Shoe* remains intact.

The most cursory examination of the Tennessee statutes, T.C.A. §§ 20–235 to 20–240, reveals that they are well within the constitutional boundaries delineated by *International Shoe, McGee,* and *Hanson.* Therefore, the only remaining question is to decide how much of the state's power it intended to exercise, and if this case comes within the statute as thus interpreted.

There are several guidelines which this court has utilized in ascertaining how the Tennessee Supreme Court will interpret the statutes involved herein. The first of these is provided by the statute itself. T.C.A. § 20–240 provides, "Nothing contained in §§ 20–235—20–240 shall limit or affect the service of process in any other manner now provided by law. This law is in the nature of remedial legislation and it is the legislative intent that it be given a liberal construction." Since these statutes were passed into law approximately seven years after the *Hanson* case it must be assumed that the lawmakers were familiar with the rule of that case and its predecessors. Assuming this familiarity, section 20–240 surely indicates that the legislature wished to extend the state's jurisdiction to the outermost limits permitted by *International Shoe.* There is also an inference that the legislature intended a broad application of this statute simply by virtue of its passage, when it is also considered that there was already on the books of Tennessee a conventional "doing business" statute, T.C.A. § 20–220. A new statute would not have been needed had not an expanded interpretation been desired. It is also noted that there had been a trend in the recent Tennessee decisions interpreting the "doing business" statute to give that statute a broader application than it had traditionally received. Smartt v. Coca-Cola Bottling Corp., 318 F.2d 447 (6th Cir. 1963).

It was also noted by the court that the Tennessee statute is substantially identical to the Illinois "long arm" statute. That statute, Ch. 110 Civ.Pr.Act § 17, Ill.Rev.Stat.1965, C. 110, § 17, provides as follows:

"(1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

"(a) The transaction of any business within this State;

"(b) The commission of a tortious act within this State;

"(c) The ownership, use, or possession of any real estate situated in this State;

"(d) Contracting to insure any person, property or risk located within this State at the time of contracting."

The similarity of the statutes indicates that the Illinois act may well have been a guide to the drafter of the Tennessee statute. This conclusion is reinforced by the fact that the Illinois law is one of the older "long arm" statutes and has been copied by several states, including New York and Oregon. Even if that is not the case, however, Illinois case law would still furnish an excellent basis for predicting how the Tennessee courts will interpret Tennessee's very similar statute. The totality of the above factors indicates that the Tennessee Legislature intended to exercise the full extent of its power as restricted only by the Fourteenth Amendment. That interpretation was given the Illinois law in the decision of Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957). Accepting this interpretation of the Tennessee law, there remains only the problem of determining if there were in this case the "minimum contacts" required by *International Shoe*.

In June of 1965, Mr. Pilkington contacted the defendant for the purpose of offering his services as representative for defendant in a number of southern states. The offer was not immediately accepted, and later that same summer Pilkington again called the defendant to make the same offer, except this time Pilkington was able to give the defendant definite information about possible jobs he might be able to secure for the defendant. One of these jobs was some work for the plaintiff, on the contract which precipitated this action. The defendant expressed an interest and asked for more detailed information. At defendant's request prints and drawings were sent from Tennessee to Wisconsin. In the weeks that followed there were several telephone conversations between Pilkington, in Tennessee, and the defendant in Wisconsin. During several of these conversations the defendant requested additional information, and each time it was sent to defendant's Wisconsin office. On August 27, 1965, defendant wrote Pilkington with regard to a quotation on a job for Perfect Equipment Corporation, in Murfreesboro, Tennessee. In that letter the defendant expressed a desire to perform certain machining operations for Perfect Equipment. This certainly demonstrates that the defendant had some other contact with the state of Tennessee other than those out of which this action arose.

On November 12, 1965, the defendant submitted a quotation to the plaintiff. This action was followed by personal visits to plaintiff's offices in Nashville by defendant's vice-president, Mr. John D. Lehman, on November 19 and 23, 1965, the purpose of which was negotiation of contract. The November 23 meeting was attended by plaintiff's representatives, defendant's vice-president and its representative, and representatives of the Aluminum Company of America. The meeting lasted for several hours. During the meeting defendant sought to have certain aspects of the design changed, contending that these changes would facilitate the machine work which had to be performed. The changes were permitted and, in consideration thereof, defendant lowered its price from $1.06 per unit to $1.03 per unit. Apparently, at the end of this meeting the essential terms of the contract had been settled. Defendant's agent again came to Nashville on January 20, 1966, to deliver to plaintiff forty-five finished shells, as a pilot lot, for plaintiff's inspection. Finally on April 21, 1966, representatives of the defendant came to the plaintiff's Nashville office and informed plaintiff that it would no longer continue to perform under the contract.

There are several conclusions to be drawn from the above state of facts. The instant contract is not defendant's only contact with the state of Tennessee. Indeed the agency agreement executed between defendant and Pilkington anticipates that the defendant would be performing many jobs for Tennessee concerns. The agreement states that it would be the duty of Pilkington to solicit business for defendant in an area

which included Tennessee. It would certainly seem that defendant was deliberately invoking the benefit of the laws of the state of Tennessee, and therefore it is not unreasonable to ask it to defend a suit arising out of business obtained in this state. This does not offend any "traditional notions of fair play and substantial justice."

It is difficult to compare cases in this field because each case must turn on its own facts. The contacts must be judged in the light of the particular circumstances of that case. As was said in Agrashell, Inc. v. Bernard Sirotta Co., 229 F.Supp. 98, 102 (E.D.N.Y.1964), "To determine jurisdiction, the nature of all the activities of a foreign corporation in connection with the State must be weighed. This includes negotiations, solicitation of orders, contracts, number of shipments, volume of business and any other acts indicating the extent to which the corporation exercises the privilege of acting within the State and enjoying the protection of its laws." On the appeal of this case, 344 F.2d 583 (2nd Cir. 1965), the rule was established that, when the nonresident shipper assumed the risk of transportation to the buyer's place of business, the nonresident had availed himself of the protection of the buyer's state and thereby submitted to that state's jurisdiction. In Hicks v. Crane Co., 235 F.Supp. 609 (D.Ore.1964), it was held that a manufacturer who shipped some equipment to an Oregon buyer, and then went to Oregon to give the buyer advice about installation, had sufficient contacts with the state of Oregon to permit Oregon to assert jurisdiction over him for a breach of warranty suit arising out of that equipment. For a case which held that negotiations which occurred in Illinois sufficed to render the parties subject to the jurisdiction of the Illinois courts, see National Gas Appliance Corporation v. AB Electrolux, 270 F.2d 472 (7th Cir. 1959). The acts of negotiation without regard to the place of the making of the contract, were regarded as sufficient to satisfy the standard of *International Shoe.* In Wisconsin Metal and Chemical Corporation v. DeZurik Corporation, 222 F.Supp. 119, 123 (E.D. Wis. 1963), the court said, "It is entirely reasonable to expect a corporation which authorizes a manufacturer's representative to solicit orders for the sale of its products in the state and which delivers its product to a Wisconsin plaintiff pursuant to such order to defend an action brought by a buyer in this state for damages for an alleged breach of warranty arising out of the agreements of the parties." This reasoning would appear to have equal force in a breach of contract action such as here presented.

The rule has been established in Illinois that merely distributing one's product through an independent contractor will not subject a defendant to the jurisdiction of that state. Insull v. New York World-Telegram Corporation, 273 F.2d 166 (7th Cir. 1959). However, the Illinois courts have said that, if a person or corporation carries out the performance of jurisdictional acts while physically present in the state, he thereby submits to that state's jurisdiction. In the cases of Kropp Forge Co. v. Jawitz, 37 Ill.App.2d 475, 186 N.E.2d 76 (1962) and Saletko v. Willys Motors, Inc., 36 Ill.App.2d 7, 183 N.E.2d 569 (1962), the court said that where a party actually negotiated or partially negotiated a contract while physically present in Illinois it would not offend fair play to subject that person to the jurisdiction of the Illinois courts even though the contract was executed elsewhere.

█ Almost all of the negotiations in the instant case occurred in Tennessee while an agent of the defendant was personally present in Tennessee. He was at that time deliberately availing himself of the benefit of Tennessee laws, and to therefore subject the defendant to the jurisdiction of the Tennessee courts does not seem unfair where such jurisdiction is limited to matters which grew out of these contacts with this state.

The motion to dismiss is denied.