**AMERICAN COMPRESSED STEEL CORPORATION, a New Jersey Corporation, Plaintiff,**

v.

**PETTIBONE MULLIKEN CORP., a Delaware Corporation,**

and

**Hammermills, Inc., a Missouri Corporation, Defendants.**

No. 6277.

United States District Court
S. D. Ohio, W. D.
April 21, 1967.

Howard Gould, Cincinnati, Ohio, for plaintiff.

John W. Hudson, Cincinnati, Ohio, Bruce Parkhill, Chicago, Ill., for defendants.

## OPINION

HOGAN, District Judge.

The plaintiff, American Compressed Steel Corporation, a New Jersey corporation with its principal place of business in Cincinnati (American), filed a complaint against the defendants, Pettibone Mulliken Corporation, a Delaware corporation having its principal place of business in Chicago, Illinois (Pettibone), and Hammermills, Inc., a Missouri corporation having its principal place of business in Iowa (Hammermills). Neither of the defendants has a place of business in Ohio; neither defendant is "doing business" in Ohio in the generally accepted sense of that term. The complaint sets forth causes of action for damages aggregating $119,500.00 based on the alleged breach of a contract dated December 31, 1962, between American and Hammermills.

Personal jurisdiction is claimed in respect of both defendants under Ohio's recently enacted (1965) "long-arm" statute, Ohio Revised Code § 2307.382, which provides, insofar as applicable to this controversy and necessary to the conclusions arrived at herein, as follows:

"A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's

"1) Transacting any business in this state; * * *

When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him."

The alleged breach of the contract in this case occurred in 1963 and prior to the effective date of the Ohio "long-arm" statute. The question of the retroactivity of the Ohio "long-arm" statute has not been determined by either the Ohio Supreme Court or any Ohio appellate court. This Court (the Honorable John W. Peck, now Circuit Judge) concluded in Partin v. Hassan et al., No. 5979, that the Ohio "long-arm" statute was not retroactive. The opinion is reported in 363 F.2d 104, although the question was not passed on by the Court of Appeals. The question has been giving the Ohio common pleas courts difficulty, witness conflicting conclusions in O'Mara v. Alberto-Culver Co., 6 Ohio Misc. 132, 215 N.E.2d 735, 35 Ohio Op.2d 30, Hamilton County, Ohio, Common Pleas (1966); and Bruney v. Little, 8 Ohio Misc. 393, 222 N.E.2d 446, 37 Ohio Op.2d 100, Belmont County, Ohio, Court of Common Pleas (1966).

 While the question may lurk here, it is unnecessary to meet it since all three parties to this case have conceded retroactivity. The concession of a possible objection to in personam jurisdiction does not waive other objections. It is so held.

In 1962, the plaintiff became interested in a machine advertised by Hammermills and of Hammermills manufacture, called "a Bulldog Special" Hammermills machine. The plaintiff is engaged in scrap metal processing operations. The plaintiff contacted Hammermills in September or October of 1962 and let Hammermills know of its interest in purchasing a machine of the general characteristics noted in the advertising.

Subsequently a Mr. Oberhellmann, a Vice President of Hammermills, came to Cincinnati on October 15, 1962, and again on October 31, 1962, and on those dates negotiations took place relative to the machine, particular specifications, and design. The machine involved was not a stock item, but was a "custom" item; preliminary to an order for such a machine, discussions relative to specifications, capacity, operation, maintenance, sales price, selling terms, diagrams, blue prints, and sales aids were in order and took place in this factual situation. On October 27, 1962, and December 17, 1962, the plaintiff's President went to St. Louis and there discussed and negotiated with Hammermills.

Mr. Oberhellmann at the October negotiating meetings in Cincinnati was accompanied by a Mr. W. D. Busch, who was in fact a manufacturers representative for Hammermills (and a number of other companies unrelated to this lawsuit) and who did in fact live in Cleveland, Ohio. He carried a calling card identifying himself as a "Representative" of "Hammermills" (and three other urelated companies) "in the Mideast." The same calling card identified the Hammermills Vice President as the Representative "in the Midwest."

Mr. Busch, as a manufacturers representative, was authorized by Hammermills to solicit interest in Hammermills' products in Ohio and elsewhere. He was an independent contractor; he was not authorized to make any commitment or contract for Hammermills; his repetitive presence in the company of Hammermills' Vice President, during negotiations in Ohio, is indicative of at least a connection between the manufacturers representative and, in the language of the statute, "transacting any business in this state."

The written contract was dated December 31, 1962, the parties being Hammermills (described on the form contract as a "subsidiary of Pettibone") and American. Actually it was signed by American in Cincinnati on January 24, 1963, and it is significant that on that date the Hammermills Vice President Mr. Oberhellmann came to Cincinnati with Mr. Busch and met with the President of American. Hammermills executed the contract in Iowa on January 28, 1963. Mr. Oberhellmann was one of the Hammermills officers who executed the contract. In our view it is not necessary to determine whether the contract was finally executed in Ohio or Iowa; whether it was to be governed by the law of Ohio or Iowa; what, if any, significance is to be attached to the contractual provision of the contract price being "FOB cars, Cedar Rapids, Iowa;" or whether the machine, when made, was to be delivered by somebody to Ohio and used in Ohio. There is no doubt about the latter, although it is unnecessary to decide.

On February 12, 1963, Mr. Oberhellmann returned to Cincinnati to deliver to American drawings for the proposed machine. Again he was accompanied by Mr. Busch. The trip was obviously for the purpose of "transacting * * * business" and not as a substitute for the mails. In July of 1963 officials of American went to the Hammermills plant in Cedar Rapids, Iowa, and at or about that time there arose the differences between the parties to the contract which eventually led to the filing of this case. While there were substantial negotiations between the parties subsequent to July of 1963, some by letter, some by telephone, some by conferences in Cincinnati—all had to do with what appears to be efforts to work out the differences. The tinge in those post-July, 1963, dealings was compromise. We attach no significance to those compromise dealings in determining the question before this Court. While appearances in a state in an effort to compromise a bona fide dispute may be the "transaction of business" in the accepted business of economic sense, it is at least questionable whether the historic policy of the law favoring compromises would permit such activity to be held as "business" in the

legal sense as that term is used in "long-arm" statutes. Compare Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 239 F.2d 502 (C.A.4 1956); Perlmutter v. Standard Roofing, etc., Co., 43 Misc.2d 885, 252 N.Y.S.2d 583 (1964); Ohio Casualty Insurance Co. v. First National Bank, Okl., 425 P.2d 934 (Supreme Court, 2/28/67).

The defendant Pettibone's connection with this entire transaction is as follows: First, Hammermills is a wholly owned subsidiary of Pettibone. Secondly, one of the "compromise" meetings in Cincinnati, on October 3, 1963, was attended by a Mr. Knudten, who was President of Hammermills and a Vice President of Pettibone. However, it clearly appears from the affidavits in this record that Pettibone and Hammermills are entirely separate and independently operated corporations, each of substance and each entitled to the recognition of its "separate entity." The latter wholly owned subsidiary and the former have cross-officerships.

Service on each of the defendants was accomplished in the mechanical manner prescribed by the Ohio "long-arm" statute. The defendants have each filed a motion to dismiss for want of jurisdiction over their respective persons. The defendants urge, first, that to uphold jurisdiction in this case would be violative of the due process guaranteed by the 14th Amendment to the Constitution of the United States; and secondly, that the Ohio statute was copied after a similar Illinois "long-arm" statute after that Illinois statute had received a construction by the highest court of Illinois; that such construction should be given great weight in this state and, if followed, would result in the granting of both motions.

The Constitutional guidelines are set forth in International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

From them we learn (in their respective order):

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

"[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

"[I]t is a mistake to assume that this trend heralds the eventual demise of all restriction on the personal jurisdiction of state courts."

Since the Ohio statute, insofar as we are concerned with it here, limits "long-arm" jurisdiction over a person to causes of action arising out of his transaction of any business in Ohio, and since the word "business" must receive an ordinary every-day construction of something more than de minimis, it is clear that the Ohio statute is well within the Constitutional boundaries.

The next question is whether or not, as to each defendant, the respective activity in Ohio fits the "minimum contacts," meaning such contacts based on which the maintenance of this suit would not offend traditional notions of fair play.

As applied to Pettibone, it is concluded that it did not "transact any business" in this state to such minimal extent. A person such as Mr. Oberhellmann, who has two hats, is free to wear only one of them and his trips to Cin-

cinnati were obviously related to the defendant Hammermills. Nor do the "long-arm" statutes abolish the traditional recognition of the separate entity of an independent subsidiary. The motion to dismiss as to Pettibone should be and is sustained.

With respect to Hammermills—it is quite true that the Ohio "long-arm" statute was fashioned in 1965 after its elder (by approximately ten years) Illinois brother. It is also true that the Ohio Supreme Court has held as recently as 1965 in Schneider v. Laffoon, 4 Ohio St. 2d 89, 212 N.E.2d 801, that "where the Ohio General Assembly has adopted statutory provisions from another state after those provisions have been construed by the highest court of that state, such construction will be given great weight in this state and will *usually* be followed." (Italics added.)

It is also true that the court of last resort in Illinois, in Grobark v. Addo Machine Co., Inc., 16 Ill.2d 426, 158 N.E.2d 73 (1959) concluded that a nonresident of Illinois, whose business activities in Illinois had been to all intents and purposes the same as Hammermills' activities in Ohio, did not have the "minimum contacts" in Illinois based on which it could be said as a matter of construction of the Illinois statute that it was "transacting any business in Illinois." Defendant Hammermills' argument is particularly forceful in a state which, historically, has tended to strictly construe comparable statutes. Compare Snavely v. Wilkinson, 138 Ohio St. 125, 33 N.E.2d 999 (1941); and Harris v. Owens, 142 Ohio St. 379, 52 N.E.2d 522 (1943)—dealing with the interstate and intrastate automobile tort statutes.

However, the *Grobark* case, while apparently still the last word of the Illinois court of last resort, has had a history which invites an Ohio court to the "unusual." (Apparently no Ohio court has to date been reported as having had the problem.) So, it is a matter of "our belief" of what the Ohio courts "would

hold." Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (C.A.2d, 2/28/67). *Grobark* has met strong professorial criticism. "Curry, The Growth of the Long-Arm," (63 Ill.L.F. 533). *Grobark* has been referred to as "brushed aside" in Kropp Forge Co. v. Jawitz, 37 Ill.App.2d 475, 186 N.E.2d 76 (1962); or "weakened" (Saletko v. Willy's Motors, 36 Ill.App.2d 7, 183 N.E.2d 569) by subsequent Illinois appellate decisions which, significantly, were also decided prior to the adoption by Ohio of the "long-arm" statute. That situation could itself be described as somewhat unusual. In a case in this Circuit remarkably similar on its facts, presenting the precise legal point involved (since Tennessee likewise copied the Illinois statute), District Judge Frank Gray, Jr., of the Middle District of Tennessee, in Temco, Inc. v. General Screw Products, Inc., 261 F. Supp. 793 (D.C.1966) considered the *Kropp Forge* case as the Illinois construction to be recognized.

Since this case was submitted, the Second Circuit has announced its decision in *Liquid Carriers Corp.*, supra. The New York statute is identical, in the respects involved here, with both the Ohio and Illinois statutes. The Second Circuit stated the question before it as follows: In the leading case of Longines-Wittnauer Watch Co. v. Barnes & Reinecke, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, the New York Court of Appeals found a transaction of business based upon "substantial preliminary negotiations through high-level personnel during a period of some two months; the actual execution of a supplementary contract; the shipment for use here, subject to acceptance following delivery, of two specially designed machines, priced at the not inconsiderable sum of $118,-000; and the rendition of services over a period of some three months by two of the appellant's top engineers in supervising the installation and testing of the complex machines."

"On the other hand, in Kramer v. Vogl, 17 N.Y.2d 27, 267 N.Y.S.2d 900,

215 N.E.2d 159 (1966) where no representatives of the defendant were physically present in New York, the Court * * * found there was not a 'transaction of business' within the state when the only solicitation was by out-of-state mailings. * * *

"[W]e have found no case dealing with the precise fact situation presented here. We must now decide the question left open in Longines-Wittnauer Watch Co. * * * of whether the substantial preliminary negotiations, conducted in New York by * * * high-level personnel * * * over a period of two months, but unaccompanied by the other activities that were present in Longines-Wittnauer after execution of the negotiated contract are enough to meet the statutory requirements for transaction of business under CPLR Section 302 (a)1."

That Court, in its decision, said:

"[I]n the present case, a high-level agent and officer * * * made three separate trips to New York over a period of two months to meet and negotiate * * * in connection with the contract involved in this suit. The [defendant] stood to derive considerable economic benefit from these excursions to New York. Because of the nature of the negotiations involving the complex technical problems of building a chemical-carrying barge, it it unlikely that the contract could have been negotiated otherwise than by such face-to-face meetings between the parties. * * * it is clear that [defendant's] vice president purposefully entered New York state in connection with his corporation's dealings * * * and caused his corporation to be protected by New York law. The activities * * * were sufficiently extensive and purposeful to constitute a transaction of business * * * and to subject [defendant] to the jurisdiction of the New York courts." 375 F.2d 956.

It is the conclusion of this Court that Hammermills' activities in Ohio, as outlined above, were well above the minimal contacts to the end that the maintenance of this suit as against it does not offend traditional notions of fair play and substantial justice. The motion to dismiss as to Hammermills will be overruled and an order in conformity with this opinion may be presented.